**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Jenna L. Gavenman (State Bar No. 348510)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jgavenman@bursor.com

**THE BARRY LAW OFFICE, LTD**
Peter F. Barry (MN #0266577)
Admitted *pro hac vice*
333 Washington Ave No, Suite 300-9038
Minneapolis, MN 55401-1353
Telephone: (612) 379-8800
E-mail: pbarry@lawpoint.com

**SWIGART LAW GROUP, APC**
Joshua B. Swigart (State Bar No. 225557)
2221 Camino del Rio S, Suite 308
San Diego, CA 92108
Telephone: (866) 219-3343
Facsimile: (866) 219-8344
E-mail: Josh@SwigartLawGroup.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JONATHAN LYNCH, individually and on behalf of all others similarly situated,

Plaintiff,

v.

EXPRESS SCRIPTS HOLDING COMPANY,

Defendant.

Case No. 3:23-cv-01170-AMO

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Date: January 11, 2024
Time: 2:00 p.m.
Courtroom: 10
Judge: Hon. Araceli Martínez-Olguín

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. PLAINTIFF HAS SUFFICIENTLY ALLEGED THAT HE SUFFERED AN INJURY-IN-FACT CONFERRING ARTICLE III STANDING ........ 2

II. PLAINTIFF DID NOT CONSENT TO THE USE OF META'S PIXEL TECHNOLOGY ON THIRD-PARTY WEBSITES ........ 4

III. PLAINTIFF HAS SUFFICIENTLY PLED HIS WIRETAPPING CLAIMS ........ 7

A. Plaintiff's Wiretap Claims Are Timely ........ 7

B. Express Scripts Is Liable For Enabling Facebook's Wiretapping ........ 9

C. Plaintiff Has Alleged Interception Of "Content" ........ 10

D. Plaintiff Has Pled Interception Of Communications "In Transit" ........ 11

E. Plaintiff's CIPA Claim is More Than Sufficiently Pled ........ 13

1. Plaintiff has clearly pled his CIPA aiding and abetting claim against Express Scripts. ........ 13

2. Express Scripts can be held liable for aiding, agreeing with, or employing Facebook Pixel to intercept Plaintiff's internet communications . ........ 13

3. The territorial scope of the class is to be decided at class certification ........ 16

IV. DEFENDANT VIOLATED THE CMIA ........ 17

A. Plaintiff Has Sufficiently Alleged His Medical Information Is at Issue. ........ 17

B. Plaintiff Plausibly Alleged His Medical Information was Actually Viewed by a Third Party. ........ 21

V. PLAINTIFF HAS ALLEGED A RIGHT OF ACTION UNDER THE CCPA ........ 23

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 22

*Bonnichsen v. United States*,
367 F.3d 864 (9th Cir. 2004) ........ 9

*Byars v. Goodyear Tire & Rubber Co.*,
2023 WL 1788553 (C.D. Cal. Feb. 3, 2023) ........ 11

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ........ 12

*CFPB v. D & D Mktg.*,
2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) ........ 8

*Clancy v. The Bromley Tea Co.*,
308 F.R.D. 564 (N.D. Cal. 2013) ........ 17

*Clifton v. Houghton Mifflin Harcourt Publ'g Co*.,
152 F. Supp. 3d 1221 (N.D. Cal. 2015) ........ 8

*Colleen M. v. Fertility & Surgical Assocs. of Thousand Oaks*,
132 Cal. App. 4th 1466 (2005) ........ 21

*Cothron v. White Castle Sys., Inc.*,
467 F. Supp. 3d 604 (N.D. Ill. 2020) ........ 15

*Cousin v. Sharp Healthcare*,
2023 WL 4484441 (S.D. Cal. July 12, 2023) ........ 11

*E&J Gallo Winery v. EnCana Energy Services, Inc.*,
2004 WL 7342782 (E.D. Cal. 2004) ........ 4

*Eisenhower Med. Ctr. v. Superior Ct.,*
226 Cal. App. 4th 430 (2014) ........ 20, 21

*Fenerjian v. Nongshim Co., Ltd*,
72 F. Supp. 3d 1058 (N.D. Cal. 2014) ........ 9

*Fitzhenry-Russell v. Coca-Cola Co.*,
2017 WL 4680073 (N.D. Cal. Oct. 18, 2017) ........ 16

*Garcia v. Build.com, Inc.*,
2023 WL 4535531 (S.D. Cal. July 13, 2013) ........ 4

*Gearhart v. Express Scripts, Inc.*,
422 F. Supp. 3d 1217 (E.D. Ky. 2019) .......... 23

*Greenley v. Kochava, Inc.*,
2023 WL 4833466 (S.D. Cal. July 27, 2023) .......... 5

*Gueyffier v. Ann Summers, Ltd.*,
43 Cal. 4th 1179 (Cal. 2008) .......... 23

*Harris v. Harris*,
935 F.3d 670 (9th Cir. 2019) .......... 9

*Heintze v. Wells Fargo Bank, N.A.*,
2015 WL 12696455 (C.D. Cal. June 19, 2015) .......... 7

*In re Blackbaud, Inc., Customer Data Breach Litigation*,
2021 WL 3568394 (D.S.C. Aug. 12, 2021) .......... 18

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,
2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) .......... 8

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 10

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 5

*In re Hulu Priv'y Litigation*,
2014 WL 1724344 (N.D. Cal., Apr. 28, 2014) .......... 18

*In re Lenovo Adware Litig.*,
2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) .......... 9, 14

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litigation*,
603 F. Supp. 3d 1183 (S.D. Fla. 2022) .......... 22

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......... passim

*In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*,
613 F. Supp. 3d 1284 (S.D. Cal. 2020) .......... 3, 22

*In re Tracht Gut, LLC*,
836 F.3d 1146 (9th Cir. 2016) .......... 21

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) .......... 12

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) .......... 12

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal., July 20, 2023) ........ 18

*Javier v. Assurance IQ, LLC*,
2021 WL 940319 (N.D. Cal. Mar. 9, 2021) ........ 5

*Javier v. Assurance IQ, LLC*,
2023 WL 114225 (N.D. Cal. Jan. 5, 2023)........ 10

*Johannson v. Wachovia Mortg. FSB*,
2011 WL 3443952 (N.D. Cal. Aug. 5, 2011) ........ 9

*Kauders v. Uber Techs., Inc.*,
2019 WL 510568 (Mass. Super. Ct. Jan. 3, 2019) ........ 15

*Lehman Brothers Holdings, Inc. v. Mason McDuffie Mortgage Corp.,*
2013 WL 76285 (N.D. Cal., Jan. 4, 2013)........ 22

*Lindsay-Stern v. Garamszegi*,
2016 WL 11745948 (C.D. Cal. Oct. 13, 2016) ........ 13

*Martin v. Sephora USA, Inc.*,
2023 WL 2717636 (E.D. Cal. Mar. 30, 2023)........ 12

*Matera v. Google Inc*.,
2016 WL 5339806 (N.D. Cal. Sept. 23, 2016)........ 5

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021)........ 16

*Music v. Bank of Am., Nat'l Ass'n*,
2015 WL 5138140 (N.D. Cal. Sept. 1, 2015)........ 8

*Opperman v. Path, Inc.,*
205 F. Supp. 3d 1064 (N.D. Cal. 2016)........ 16

*People v. Snyder*,
22 Cal. 4th 304 (2000)........ 9

*Precht v. Kia Motors Am., Inc.*,
2014 WL 10988343 (C.D. Cal. Dec. 29, 2014)........ 17

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ........ 10, 12, 14

*Ribas v. Clark*,
38 Cal. 3d 355 (1985)........ 12, 14

*Rodriguez v. Google, LLC*,
2022 WL 214552 (N.D. Cal. Jan. 25, 2022)........ 12

*Saleh v. Nike, Inc.*,
562 F. Supp. 3d 503 (C.D. Cal. 2021) ... 10, 11, 14

*Sellers v. Bleacher Report, Inc.*,
2023 WL 4850180 (N.D. Cal., July 28, 2023) ... 18

*Smith v. Facebook, Inc.,*
262 F. Supp. 3d. 943 (N.D. Cal. 2017) ... 20

*Stasi v. Inmediata Health Grp. Corp*.,
501 F. Supp. 3d 898 (S.D. Cal. 2020) ... 3, 22

*Supermail Cargo, Inc. v. United States*,
68 F.3d 1204 (9th Cir. 1995) ... 7

*Sussman v. Am. Broad. Companies, Inc.*,
186 F.3d 1200 (9th Cir. 1999) ... 7

*U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc*.,
720 F.3d 1174 (9th Cir. 2013) ... 7

*Valentine v. NebuAd, Inc.*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011) ... 17

*Vigil v. Muir Med Grp. IPA, Inc.*,
84 Cal. App. 5th 197 (2022) ... 3

*Wescott v. Beresford Corp*.,
2022 WL 1062061 (N.D. Cal. Apr. 8, 2022) ... 7

*Yan Mei Zheng-Lawson v. Toyota Motor Corp.*,
2018 WL 2298963 (N.D. Cal. May 21, 2018) ... 16

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) ... 10, 11, 13

**STATUTES**

18 U.S.C. § 2511(2)(d) ... 4, 7

18 U.S.C. § 2510-2523 ... 2

Cal. Civ. Code § 56.05(i) ... 17, 18, 20

Cal. Civ. Code § 56.10(a) ... 17

Cal. Civ. Code § 56.101 ... 2, 17

Cal. Civ. Code § 1798.81.5 ... 24, 25

Cal. Civ. Code § 1798.140 ........ 23

Cal. Civ. Code § 1798.145 ........ 23

Cal. Civ. Code § 1798.146 ........ 23

Cal. Civ. Code § 1798.150 ........ 2, 24

Cal. Civ. Code § 3532 ........ 23

Cal. Pen. Code § 631 ........ passim

Cal. Pen. Code § 632 ........ passim

## INTRODUCTION

Thousands of people turn to Express Scripts ("Defendant") each month for medical treatment and prescription discounts. No one would expect that their use of Express Scripts would, in turn, deliver their sensitive health data to the hands of third parties to be used for whatever purpose they see fit. But that is exactly what happened: Express Scripts disclosed, and Meta Platforms, Inc. ("Facebook" or "Meta") intercepted, users' health data from the Express Scripts platform whenever they accessed the website. This occurred by design, not by accident, because Defendant installed the "Facebook Tracking Pixel" (the "Pixel") on its website and programmed it to quietly listen in on patients' communications with Defendant.

The Facebook Tracking Pixel is a piece of code that can be integrated into websites, like Defendant's, by incorporating it in the website's source code. When a person visits a website that contains the Pixel, the Pixel tracks their actions across the website and transmits the information—including the user's private communications (HTTP Requests), personal identifying information, and information about their past, present, or future medical conditions and/or treatment—to Facebook's servers. The information Facebook receives is transmitted alongside the website visitor's "c_userID" (*i.e.*, Facebook ID) which associates and links that information to the visitor's Facebook profile. Facebook then compiles this information into generalized datasets, allowing Defendant to run advertisements that target users who viewed particular content.

Importantly, this would not have happened but for Defendant's decision to install the Pixel. Although the Pixel is automatically configured to collect certain data, website owners, like Defendant, can instruct the Pixel to capture more specific pieces of information. Plaintiff Jonathan Lynch ("Plaintiff") therefore alleges that, by placing this tracking tool throughout the Express Scripts website, Defendant knowingly disclosed his medical information to Facebook and intentionally assisted the social media giant with intercepting his communications.

Defendant has no compelling defense. First, Defendant argues that Plaintiff lacks standing to pursue his claims, blatantly ignoring Plaintiff's allegations that he was an Express Scripts patient, that his prescription and medical condition information fits within the federal and state law definitions of confidential or sensitive medical information, and that Defendant impermissibly shared all of his

communications with Facebook by virtue of the Pixel software. Second, Defendant asserts that Plaintiff consented to the wiretap, but nothing in Facebook's or Express Script's terms and policies would have informed Plaintiff that patient information (let alone confidential medical data) provided on Express Scripts' website would be distributed to Facebook to enable Facebook "to generate highly-profitable targeted advertising on- and off-Facebook." Plaintiff's First Amended Complaint ("FAC") ¶ 34.

Defendant incorrectly argues that the remainder of Plaintiff's wiretapping claims under the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, along with Plaintiff's claims under the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. §§ 2510-2523, the Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56.101, and the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150, should all be dismissed due to, among other reasons, insufficient allegations in the FAC. Defendant's Notice of Motion and Motion to Dismiss First Amended Complaint ("MTD") at vii-viii. For the reasons set forth below, the Court should deny Defendant's Motion in full.

## ARGUMENT

### I. PLAINTIFF HAS SUFFICIENTLY ALLEGED THAT HE SUFFERED AN INJURY-IN-FACT CONFERRING ARTICLE III STANDING

Defendant argues that Plaintiff lacks standing to pursue the underlying claims because the fact that Plaintiff "entered medical information on some identified page or pages of the Express Scripts website to place prescriptions is *not* equivalent to factually alleging that the information was 'intercepted' by the Facebook pixel or that the information "constitute[d] sensitive or confidential information" that "could possibly 'implicate[ ] . . . any harm to [his] privacy" if disseminated to Facebook. MTD at 7. Not so.

Plaintiff's purported failure to allege that Defendant disclosed his medical information ignores Plaintiff's allegations that he was an Express Scripts patient, that his prescription and medical condition information fits within the federal and state law definitions of confidential or sensitive medical information, and that Defendant impermissibly shared all of his communications with Facebook by virtue of the Pixel software—which in turn enabled Facebook to able to link this data to his Facebook profile

and use it in advertising.[1] Indeed, as the FAC alleges, the very purpose of the Pixel was to share information with Facebook for advertising purposes. FAC ¶¶ 34-35, 49-50, 98, 176. Further, Defendant cites no authority suggesting that Plaintiff must specifically allege that the Pixel was "embedded on the pages" of Express Scripts' website on which his medical information was entered for purposes of obtaining prescriptions.

Instead, to establish an injury-in-fact and pursue a claim for violation of privacy rights under federal and state law, Plaintiff need only plead a plausible inference that Facebook actually viewed his medical information. *See*, *e.g.*, *Vigil v. Muir Med Grp. IPA, Inc.*, 84 Cal. App. 5th 197, 218 (2022) (concluding that at the pleading stage, plaintiffs need only plead facts sufficient to raise "a reasonable inference that 'someone' viewed the confidential information") (citing *Stasi v. Inmediata Health Grp. Corp*., 501 F. Supp. 3d 898, 924 (S.D. Cal. 2020)); *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1299 (S.D. Cal. 2020) ("Plaintiffs have plausibly pled facts that could give rise to the inference that their medical information has been viewed by an unauthorized third party.").

Plaintiff's allegations are sufficient. The FAC alleges that Facebook collaborates with Express Scripts to use the Pixel software tool to view, categorize and extrapolate the data, and that Facebook ultimately receives and uses the data to micro target consumers or to enable Defendant to do so. FAC ¶¶ 34-36, 49, 131-37. It is unclear from Defendant's motion how Facebook could process and categorize the data received without first learning the contents of the data. Facebook made the Pixel available to Defendant because it sought data the Pixel was designed to collect. *See id; In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 785 (N.D. Cal. 2022) (noting that the Pixel on a website "sends certain data to Meta," which "will attempt to match the customer data that it receives to Meta users," and that "the Pixel transmits information showing patient status," which is protected health information under HIPAA). Nothing more is required at this stage to establish Plaintiff's standing under the relevant statutes,

---

[1] For example, the FAC alleges that "[t]o obtain prescriptions to treat low insulin and testosterone levels, Plaintiff was required to enter his name, email address, phone number, address, and payment information," and "was also required to input further information, such as his date of birth, gender, insurance information, and a diagnosis history related to the testosterone prescription, as it is a controlled substance." FAC ¶ 25.

particularly where Defendant is the party with exclusive knowledge of the full extent of its improper disclosures and the extent to which information was viewed by third parties without consent. *See E&J Gallo Winery v. EnCana Energy Services, Inc.*, 2004 WL 7342782, at *5 (E.D. Cal. 2004) ("The leeway typically granted a pleader is greater where the opposing party has exclusive control over information.").

Notably, as courts have recognized, to the extent that a party asserts a legally sufficient claim under federal and state eavesdropping statutes, they have established an injury-in-fact. *See, e.g.*, *Garcia v. Build.com, Inc.*, 2023 WL 4535531, at *3 (S.D. Cal. July 13, 2013) (noting that the California Legislature has already determined that "a violation [of CIPA's anti-eavesdropping prohibition] is a violation of privacy rights and is a sufficient concrete injury-in-fact" to support liability). Accordingly, Plaintiff has alleged an injury-in-fact to the extent that he has alleged facts satisfying the requirements for a claim under those laws.

Finally, Defendant argues that "Plaintiff cannot satisfy Article III's injury-in-fact requirement because Plaintiff consented to the alleged conduct," as he agreed to Defendant's "Terms and Privacy Policy" "[t]o obtain a prescription from the Express Scripts website," which referred to "the use of pixel technology." MTD at 8. Defendant has failed to establish its affirmative defense of consent as a matter of law based on Plaintiff's pleadings and the materials referenced or otherwise incorporated therein. *See infra* Arg. § II. Nor did Facebook's privacy policies (relied upon by Defendant, MTD at 17) establish the requisite consent to the use of personal health information from a third-party pharmacy website.

## II. PLAINTIFF DID NOT CONSENT TO THE USE OF META'S PIXEL TECHNOLOGY ON THIRD-PARTY WEBSITES

As an initial matter, Plaintiff improperly relies on materials that are outside of the four corners of the FAC. Defendant may not rely upon privacy policies and other documents extrinsic to Plaintiff's pleading at the pre-discovery stage to establish its affirmative defense of consent. While consent is an affirmative defense to Claimant's CIPA and federal Wiretap Act claims (*see* Cal. Pen. Code §§ 631(a), 632(a) (prohibiting wiretapping and eavesdropping "without the consent of all parties to the communication"); 18 U.S.C. § 2511(2)(d) (authorizing wiretapping "where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act")), Defendant, as "the party seeking the benefit of

the exception," has the "burden to prove consent." *Matera v. Google Inc*., 2016 WL 5339806, at *17 (N.D. Cal. Sept. 23, 2016) (internal citations and quotation marks omitted).

To establish such consent as a matter of law, Defendant has chosen to rely on disclosure policies and terms of use that, as it does not and cannot dispute, are nowhere referenced in the First Amended Complaint or any exhibits or other documents incorporated therein, and that therefore cannot properly be considered at the pleadings stage. In particular, Defendant has submitted—and asks the Court to consider—numerous materials outside of the FAC, including lengthy declarations and documents purportedly taken from Express Scripts' and other websites. *See* MTD at 2-6; Exs. A-E. The Court should decline to consider this evidence and thereby convert Defendant's dispositive motion into one for summary judgment, especially given that this case is in its infancy and the parties have engaged in no discovery. At a minimum, in the alternative, Plaintiff respectfully asks for limited discovery into the circumstances under which specific policies were disclosed to him and which version of those policies were in place at any given time in the event that the Court is inclined to grant the Defendant's instant motion.

Even if the Court would otherwise be willing to consider Defendant's terms of service or privacy policy at this stage—despite that these are extrinsic to Plaintiff's pleading and not judicially noticeable—Defendant's consent arguments would still fail because Defendant's policy would only explicitly notify account users of Defendant's practices. As this Court has recognized, "[c]onsent is . . . generally limited to the specific conduct authorized." *Javier v. Assurance IQ, LLC*, 2021 WL 940319, at *2 (N.D. Cal. Mar. 9, 2021). *See also In re Google Assistant Priv. Litig*., 457 F. Supp. 3d 797, 824 (N.D. Cal. 2020) (finding that consent to data collection does not extend to data disclosure). "Even if Plaintiff gave full consent to [Facebook or other] third-party app developers to collect his data, consent to the specific conduct does not extend to Defendant's collection of Plaintiff's data through backdoors built into apps or to Defendant's dissemination of that information for profit." *Greenley v. Kochava, Inc*., 2023 WL 4833466, at *5 (S.D. Cal. July 27, 2023). Neither Facebook's nor Defendant's terms and policies would have informed Plaintiff that patient information (let alone confidential medical data) provided on Defendant's website would be distributed to Facebook "to generate highly-profitable targeted advertising on- and off-Facebook." FAC ¶ 34; *see also In re Meta Pixel Healthcare Litigation*, 647 F. Supp. 3d at

793 (holding that Meta failed to establish that users consented to Meta's use of computer code to collect health data and patient communications from Facebook users' interactions with their medical providers' websites because although those policies stated that personal data was collected, it made no mention of health data).

In addition, as alleged in the FAC, "[o]n information and belief, Defendant's website repeatedly and continuously communicates private data to Facebook about Plaintiff and the Class Members during its signup process, including the name of the person signing up, date of birth, zip code, button text clicked, IP address, exact URL referred, and other personally identifiable information," and "Defendant's aiding and abetting of Facebook's eavesdropping on Plaintiff's and the Class Members' private communications with Defendant's website *happens well before the user of the website is ever presented any clickable links to a privacy policy or terms of service*." FAC ¶¶ 110-13 (emphasis added). Since Plaintiff and the other Class Members needed to interact with Defendant's website even prior to creating an account and since some of the unauthorized sharing of data with Facebook allegedly occurred at that time, any disclosures to account users would not establish consent with respect to those violations of CIPA and the federal Wiretap Act.

Independent of its own privacy policy, Defendant argues that "because Plaintiff alleges he is a Facebook user, . . . he also must have consented to Facebook's privacy policies to maintain an active account," and thus Plaintiff necessarily consented to Facebook's collection of data about Plaintiff's general browsing activities across the Internet (including on third-party websites like Defendant's). MTD at 17. Courts have rejected the notion that Facebook's data policies would have alerted reasonable users that Facebook would collect and use "protected health information from a medical provider," or that those policies could be read to allow such collection of health information from third parties that had no "'lawful rights to . . . share [the user's] data.'" *In re Meta Pixel Healthcare Litigation*, 647 F. Supp. 3d at 791-94 (quoting Facebook's data policy). Indeed, this case is more akin to the one recently brought by the Federal Trade Commission ("FTC") against GoodRx. *See* https://www.justice.gov/opa/pr/digital-healthcare-platform-ordered-pay-civil-penalties-and-take-corrective-action (noting that the FTC had sought a court order against GoodRx for failing to notify users that it shared their personal, identifiable health data with Facebook and Google, and used the information to target users with relevant adds).

Defendant's consent to the use of Pixel and other spyware on its website simply does not excuse it from liability for the invasion of Plaintiff's privacy with respect to his sensitive health data. Defendant argues that since it consented to permit Pixel and other spyware to track Plaintiff's communications, there cannot have been a federal Wiretap Act violation because that statute (unlike CIPA) only requires that one party to the communication have consented. MTD at 14-15. However, that ignores the fact that the one-party consent exception has its own exception, where the "communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d); *see also Sussman v. Am. Broad. Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999) (discussing the crime-tort exception). Under these circumstances, courts have recognized that the crime-tort exception could apply because "the use of patient data for advertising in the absence of express written consent is criminal and tortious," and "plaintiffs' tort claims against Meta appear[ed] viable." *In re Meta Pixel Healthcare Litigation*, 647 F. Supp. 3d at 796-98.

## III. PLAINTIFF HAS SUFFICIENTLY PLEADED HIS WIRETAPPING CLAIMS

### A. Plaintiff's Wiretap Claims Are Timely

Regarding Defendant's statute of limitations defense, "a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995). As such, a "claim may be dismissed as untimely pursuant to a 12(b)(6) motion only when the running of the statute [of limitations] is apparent on the face of the complaint." *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013) (cleaned up). Defendant has not shown a statute of limitations defect on the face of the FAC; in any event, Plaintiffs have alleged sufficient facts to toll the statute of limitations.

A "plaintiff is not required affirmatively to plead facts demonstrating that a claim is timely." *Heintze v. Wells Fargo Bank, N.A.*, 2015 WL 12696455, at *6 (C.D. Cal. June 19, 2015); *see also Wescott v. Beresford Corp.*, 2022 WL 1062061, at *5 (N.D. Cal. Apr. 8, 2022) ("The statute of limitations is an affirmative defense. At this stage, [the plaintiff] is not required to plead that his claims fall within the statute of limitations. Therefore, this claim complies with Rule 8.") (citation omitted). Instead, the relevant question is whether the face of the FAC discloses a valid statute of limitations defense. Here, it

does not, as further confirmed by Defendant's wholesale reliance on materials extrinsic to the pleadings. *See* MTD at 11 (citing exhibit purportedly showing that Defendant's "Privacy Policy linked to every page of the Express Scripts website and to which Plaintiff agreed put Plaintiff on notice of the challenged conduct").

Accordingly, Defendant's timeliness challenge must fail. *See*, *e.g.*, *Clifton v. Houghton Mifflin Harcourt Publ'g Co*., 152 F. Supp. 3d 1221, 1226 (N.D. Cal. 2015) (declining to dismiss claims on statute of limitations grounds where the face of the complaint did not demonstrate the claims were untimely); *Music v. Bank of Am., Nat'l Ass'n*, 2015 WL 5138140, at *4 (N.D. Cal. Sept. 1, 2015) (same); *CFPB v. D & D Mktg.*, 2016 WL 8849698, at *15 (C.D. Cal. Nov. 17, 2016) (same). Even if Defendant had shown that the Complaint discloses a statute of limitations defense—and it has not because neither the Facebook nor Express Scripts policies upon which Defendant relies inform reasonable consumers that personal health information on Express Scripts platform would be shared with and monetized by Facebook (*see* Declaration of Matthew Edwards ("Edwards Decl."))—Defendant's timeliness challenge still would fail.

As Defendant concedes, the statute of limitations may be tolled under the discovery rule or fraudulent concealment doctrine. MTD at 10-11. *See In re Cal. Gasoline Spot Mkt. Antitrust Litig*., 2021 WL 1176645, at *9 (N.D. Cal. Mar. 29, 2021). Plaintiff alleges that he and other Class members could not have reasonably discovered Defendant's practices of sharing their personal medical information. *See* FAC ¶¶ 104, 152-56. None of the extrinsic documents identified by Defendant establish that Plaintiff and Class members received notice of or had reasonable opportunity to discover Defendant's unlawful and unauthorized sharing of patient health care information with Facebook, in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"). *See id.* ¶¶ 116-37.

Defendant claims that these allegations are insufficient to establish when and how the discovery occurred, or that Plaintiff was reasonably diligent in not discovering the relevant conduct earlier. MTD at 11. Defendant again demands too much detail. Viewed as a whole, with all reasonable inferences drawn in Plaintiff's favor, the allegations show that Plaintiff and the Class Members discovered Defendant's wrongful conduct shortly before filing suit and that earlier discovery was precluded because the Pixel is an abstruse piece of programming code and they had no reasonable suspicion of wrongdoing (especially

of Defendant's sharing of protected health information with Facebook contrary to HIPAA's requirements and Facebook's own public statements) when they used Defendant's website. FAC ¶¶ 131-37, 152-56; *see also Johannson v. Wachovia Mortg. FSB*, 2011 WL 3443952, at *4 (N.D. Cal. Aug. 5, 2011) (denying motion to dismiss on statute of limitations grounds where it was plausible the plaintiff could not have reasonably suspected wrongdoing until later); *Fenerjian v. Nongshim Co., Ltd*, 72 F. Supp. 3d 1058, 1077 (N.D. Cal. 2014) (applying discovery rule despite availability of some public information). Defendant has not shown that Plaintiff was aware of and consented to such conduct, and he alleges that Defendant misled him as to its compliance with HIPAA and protection of any sensitive medical or other personal data.

**B. Express Scripts Is Liable For Enabling Facebook's Wiretapping**

Defendant contends that "Plaintiff's allegations that *Express Scripts* recorded its own communications with Plaintiff are barred by the party-exception rule, requiring dismissal of Plaintiff's wiretap claims." MTD at 12. That is wrong.

The text of § 631, as well as caselaw, establish that Defendant can be liable for enabling Facebook's wiretapping. Statutory interpretation begins "with the language of the statute itself." *Harris v. Harris*, 935 F.3d 670, 673 (9th Cir. 2019). Section 631 not only prohibits wiretapping, but also imposes liability for "*any person*" who "aids, agrees with, employs, or conspires with" anyone who violates section 631(a). Cal. Penal Code § 631(a) (emphasis added); *see also In re Lenovo Adware Litig.*, 2016 WL 6277245, at *8 (N.D. Cal. Oct. 27, 2016) (denying motion to dismiss CIPA claim based solely on allegation that the defendant "aided, agreed with, or conspired with" another defendant to violate section 631). Section 631(a) includes no exemption for participants to a conversation who permit third parties to eavesdrop on that conversation. *See* Cal. Penal Code § 631(a). The Ninth Circuit and California Supreme Court have held that the term "'[a]ny person' means exactly that, and may not be interpreted restrictively." *Bonnichsen v. United States*, 367 F.3d 864, 874 (9th Cir. 2004); *see People v. Snyder*, 22 Cal. 4th 304, 314 (2000).

Defendant ignores the plain text of CIPA § 631, which provides for liability for any person who "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section." Cal. Penal Code § 631(a).

Consistent with this plain language, courts have had no trouble holding defendants liable who aid, agree with, employ, or otherwise enable a third-party service provider to wiretap consumers to their websites. *See*, *e.g.*, *Javier*, 2023 WL 114225, at *6 ("Defendants argue that Plaintiff would have no claim if Assurance had created the TrustedForm software itself. This is true. But under Section 631, it has always mattered who is holding the tape recorder...") (cleaned up); *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 521 (C.D. Cal. 2021) ("[T]he court will not dismiss Count 1 against Nike for allegedly aiding, agreeing, or conspiring with FullStory to provide FullStory with Plaintiff's communications with Nike."); *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) ("Yoon has therefore stated a claim against Lululemon for violation of § 631(a)[iv]."); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Although Moosejaw cannot be liable for eavesdropping on its own communications with Revitch, the complaint adequately alleges that Moosejaw violated section 631 by enabling NaviStone's wrongdoing."). The purpose behind this subsection of CIPA is simple: "a conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon*, 549 F. Supp. 3d at 1083.

Here, Plaintiff alleges "Facebook's revenue is derived almost entirely from selling targeted advertising to Facebook users on Facebook.com and to all Internet users on non-Facebook sites that integrate Facebook marketing source code on their websites," specifically the Facebook Pixel. FAC ¶ 49. The Facebook Pixel matches "website visitors to their respective Facebook User accounts" and allows Facebook to track and "maintain profiles on users" based on their internet usage activity. *Id.* ¶¶ 47, 54. Plaintiff also alleges "Defendant deployed the Facebook Pixel software on its website." *Id.* ¶¶ 49, 83. Accordingly, Plaintiff alleges Defendant aided, agreed with, employed, or otherwise enabled Facebook's wiretapping by employing Facebook to provide the Pixel functionality, which in turn was used by Facebook—with Defendant's knowledge—to surveil Defendant's customers. *Id.* ¶¶ 59-65, 78.

### C. Plaintiff Has Alleged Interception Of "Content"

Defendant's assertion that Plaintiff does not allege the data shared or intercepted was "content" under § 631 directly contradicts the Ninth Circuit's decision in *Facebook Tracking*, which expressly held that "content" includes users "search[es]" and inputs" because they "could divulge a user's . . . queries[] and habits on third-party websites." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th

Cir. 2020); *see also Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 517–18 (C.D. Cal. 2021) (holding recording of users' "clicks, typing, scrolling, swiping, tapping, keystrokes, geographic location, IP addresses, and data entry" constitutes content). As Defendant intercepted users' "searches" and "inputs" on the Express Scripts website, by use of the Facebook Pixel, that reveal health information (e.g., prescriptions, treatment, etc.) this constitutes "contents" under § 631. *See In re Meta Pixel Healthcare Litigation*, 647 F. Supp. 3d at 796 (finding URLs containing users' search for a health condition is content because it "concern[s] the substance of a communication").[2]

Defendant's reliance on *Cousin v. Sharp Healthcare*, 2023 WL 4484441, at *3 (S.D. Cal. July 12, 2023) is misplaced. Plaintiffs in *Sharp Healthcare* failed "to factually explain their personal participation" in their allegations, and instead vaguely pointed to "hypothetical patient" searches without explaining "what personal or health information they entered on the webpage, which was then subsequently shared with Meta." *Sharp Healthcare*, 2023 WL 4484441, at *3. Plaintiff's allegations here far surpass those made in *Sharp Healthcare*.[3]

**D. Plaintiff Has Pleaded Interception Of Communications "In Transit"**

Defendant also argues that Plaintiff "has not alleged that his purported communications were intercepted while in transit." MTD at 15. Again, Defendant misconstrues the law.

---

[2] There is no "content" requirement under the first provision of CIPA § 631. *See Yoon*, 549 F. Supp. 3d at 1082 (explaining the "content" requirement only applies to CIPA provisions that use this language); *Byars v. Goodyear Tire & Rubber Co.*, 2023 WL 1788553, at *4 (C.D. Cal. Feb. 3, 2023) (same).

[3] *See*, *e.g.*, FAC ¶ 25 ("To obtain prescriptions to treat low insulin and testosterone levels, Plaintiff was required to enter his name, email address, phone number, address, and payment information … [and] his date of birth, gender, insurance information, and a diagnosis history related to the testosterone prescription."); *id.* ¶ 130 ("When a patient communicates with a health care provider's website where the Facebook Pixel is present on the patient portal login page, the Facebook Pixel source code causes the exact content of the patient's communication with their health care provider to be re-directed to Facebook in a fashion that identifies them as a patient."); *id.* ¶ 86 ("The communications sent by Plaintiff and Class Members to Defendant's servers included, but were not limited to, the following actions taken by Plaintiff and Class Members while on Defendant's website: mouse clicks and movements, keystrokes, search items, information inputted by Plaintiff and Class Members, pages and content viewed by Plaintiff and Class Members, scroll movements, and copy and paste actions."); *id.* ¶ 99 ("The electronic communications Defendant intentionally intercepted were content generated through Plaintiff's use, interaction, and communication with Defendant's website relating to the substance, purport, and/or meaning of Plaintiff's and Class Members' communications with the website.).

*First*, Defendant "ignores the plain language of section 631." *Ribas v. Clark*, 38 Cal. 3d 355, 359 (1985). CIPA § 631(a) is written in the disjunctive, imposing liability for eavesdropping on a communication "while [it] is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." Cal. Penal Code § 631(a) (emphasis added). Thus, CIPA § 631 penalizes third parties who intercept communications "while the communication[s] [are] either 'in transit' or [are] 'being sent from' and 'received at' a place within this state." *Ribas*, 38 Cal. 3d at 360 (emphasis added); *Revitch*, 2019 WL 5485330, at *2 ("the particulars of the eavesdropping mechanism are of little consequence to the section 631 analysis" because "[s]ection 631's protections extend explicitly to the beginnings and ends of communications"). Accordingly, even if Plaintiff's communications were not intercepted "in transit"—and they were—his communications were "sent from, or received at, a place within this state." FAC ¶ 81.

*Second*, Plaintiff alleges that the Express Scripts platform incorporates Facebook's Pixel technology that "is a 'piece of code'" that "re-direct[s] the content of the of the customer's communication to Facebook while the exchange of the communication between the customer and Defendant is still occurring." *Id.* ¶¶ 51, 60. Accordingly, these communications are intercepted while "in transit" prior to reaching their final destination. *Id.* ¶¶ 64-65. No additional allegations are required. *See Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 848 (N.D. Cal. 2014) (accepting allegations that communications occur "in transit" and explaining consideration of evidence to the contrary would be "premature" absent a "more developed factual record."); *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1028 (N.D. Cal. 2014) (refusing to "assum[e]" communications are not intercepted in transit as they would "contradict[] Plaintiffs' allegations").

Unsurprisingly, Defendant relies exclusively on cases involving substantially different technology where it was clear the data was not "in transit" as it was stored somewhere else first prior to being forwarded or accessed by the defendant. *See Rodriguez v. Google, LLC*, 2022 WL 214552, *1-2 (N.D. Cal. Jan. 25, 2022) (finding data is not "in transit" where it is first logged and then a second copy is transmitted); *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1228 (C.D. Cal. 2017) ("in transit" element missing where complaint showed data was transmitted to defendant "significantly after" it arrived at Smart TV); *Martin v. Sephora USA, Inc.*, 2023 WL 2717636, at *10 (E.D. Cal. Mar. 30,

2023) (finding "in transit" requirement lacking because defendant must first "record" and "create[]" a "transcript" of the communication with the chatbot, then "permit[]" the third party to access the transcript "created by [defendant]"); *Lindsay-Stern v. Garamszegi*, 2016 WL 11745948, at *4 (C.D. Cal. Oct. 13, 2016) (similar).

### E. Plaintiff's CIPA Claim Is More Than Sufficiently Pleaded

#### 1. Plaintiff Has Clearly Pleaded His CIPA Aiding And Abetting Claim Against Express Scripts

Defendant contends that it cannot tell "what entity is allegedly doing the intercepting," and that it thus does not know under what theory it is being sued. MTD at 17. The allegations set forth in Count II, however, clearly state that the CIPA claim is for aiding and abetting Facebook to intercept Plaintiff's communications with Express Scripts, as shown in the excerpts below:

> 165. ***Defendant aided and abetted the interception of components of Plaintiff's and Class Members' private electronic communications and transmissions by a third-party, Facebook***, when Plaintiff and other Class Members accessed Defendant's website from within the State of California.
>
> 166. Plaintiff and Class Members did not know ***Defendant was engaging in such interception by a third-party*** and therefore could not provide consent to have any part of their private electronic communications intercepted with the aiding and abetting of Defendant.
>
> 167. Plaintiff and Class Members were completely unaware that ***Defendant had assisted a third-party, Facebook, to intercept and store electronic communications and other personal data*** until well after it had already occurred and were therefore unable to consent.

FAC ¶¶ 165-167 (emphasis added). These allegations plainly and unmistakably inform Defendant of Plaintiff's theory of liability under CIPA. Defendant's argument is without merit.

#### 2. Express Scripts Can Be Held Liable For Aiding, Agreeing With, Or Employing Facebook Pixel To Intercept Plaintiff's Internet Communications

Express Scripts next contends that Plaintiff's allegations that Express Scripts was a party to his communications, MTD at 18, are inconsistent with aiding and abetting liability. But "a conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon*, 549 F. Supp. 3d at 1083. This observation refutes Defendant's contention that it cannot be liable for aiding and abetting violations of CIPA §631(a).

Defendant's argument runs contrary to the language of CIPA § 631(a), existing California Supreme Court's precedent and caselaw following its guidance, and the legislative purpose behind CIPA § 631(a). CIPA §631(a) provides for liability for any person who "aids, agrees with, employs, or conspires with *any person or persons* to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this action." Cal. Penal Code § 631(a) (emphasis added); *see also Lenovo Adware Litig*., 2016 WL 6277245, at *8 (denying motion to dismiss CIPA claim based solely on allegation that the defendant "aided, agreed with, or conspired with" another defendant to violate section 631). Although Defendant cannot be held liable for eavesdropping on its own communications with Plaintiff, it *can* be held liable for sharing them with Meta.

Section 631(a) includes no exemption for participants to a conversation who permit third parties to eavesdrop on that conversation. *See* Cal. Penal Code § 631(a). The decision in *Moosejaw,* 2019 WL 5485330 at *1, is particularly instructive because it involved facts that are nearly identical to those alleged here. As in this case, a retail website operator (Moosejaw) hired a third party software company (NaviStone) to "eavesdrop[] on [plaintiff's website] communications with Moosejaw." The *Moosejaw* court rejected the same argument Defendant makes here, holding that "Although Moosejaw cannot be liable for eavesdropping on its own communication with [the plaintiff], the complaint adequately alleges that Moosejaw violated section 631 by enabling NaviStone's wrongdoing." *Id.* at *2. *See also Saleh*, 562 F. Supp. 3d at 521 ("[T]he court will not dismiss Count 1 against Nike for allegedly aiding, agreeing, or conspiring with FullStory to provide FullStory with Plaintiff's communications with Nike.").

*Moosejaw* followed the California Supreme Court's decision in *Ribas*, 38 Cal. 3d 355, which held that § 631 "was designed to protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone *or listen* in on the call." (emphasis in original). "Allow[ing] third persons to eavesdrop on conversations via extensions would be a clear contradiction of the intent of section 631(a)." *Id.* The Court should thus find that Plaintiff has adequately alleged an aiding and abetting claim against Defendant.

Next, Defendant argues that Facebook did not violate section 631(a) because Plaintiff supposedly agreed to Facebook's and Express Scripts' privacy policies and thus allegedly agreed to "the use of the Facebook pixel and how it functions." MTD at 18. Thus, Defendant argues, Meta did not do anything

illegal under section 631(a) and Express Scripts cannot be found liable for aiding and abetting Meta's interceptions. But those privacy policies do not support dismissal.

*First*, as to Express Scripts' privacy policy, Defendant ignores the allegations that Facebook begins wiretapping as soon as the user accesses the Express Scripts website, before agreeing to anything, and that Express Scripts makes the terms of use or privacy policy impossible to use so as to consent to the interception of a user's communications.

> As soon as a patient takes any action on a webpage that includes the Facebook Pixel—such as clicking a button to register, login, or logout of a customer portal—Facebook's source code commands the customer's computing device to re-direct the content of the customer's communication to Facebook while the exchange of the communication between the customer and Defendant is still occurring.
>
> The Facebook Pixel code selected by Defendant and deployed on its website begins transmitting customer interactions, actions, inputs, selection, mouse clicks, mouse hovers, mouse movements, and/or keyboard inputs instantly in the first milliseconds that a customer accesses Defendant's website.
>
> Defendant has engineered and coded its website such that no human being could possibly, find, observe, and select--let alone read--the website's terms of use or privacy policy and either be made aware of or consent to such interception designed by Defendant.
>
> Defendant's aiding and abetting of Facebook's eavesdropping on Plaintiff's and the Class Members' private communications with Defendant's website happens well before the user of the website is ever presented any clickable links to a privacy policy or terms of service.

FAC, ¶¶ 60-62, 113. Hence, any purported notice and consent concerning the wiretapping could not have happened, if at all, until *after* Plaintiff had already been wiretapped. *See id.*; "Colloquially … consent implies permission given *in advance*." *Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 617 (N.D. Ill. 2020) (emphasis added) (finding no consent where White Castle asked plaintiff for consent to share biometric information after such information had already been shared); *cf. Kauders v. Uber Techs., Inc.*, 2019 WL 510568, at *5 (Mass. Super. Ct. Jan. 3, 2019) (plaintiff did not consent to arbitration where the terms were not disclosed until after the plaintiff created an account). Such *ex post facto* or after-the-fact consent cannot be valid under the plain definition of "consent." In short, every time a user visits the Express Scripts' website, and Meta is flooded with information about that user's visit before Express Scripts receives that information, Express Scripts "aids, agrees with, employs, or otherwise enables"

Meta's illegal conduct by engaging in simultaneous dissemination of Plaintiff's communications to this unannounced listener without Plaintiff's prior consent. FAC ¶¶ 63-64.

Moreover, the argument that Plaintiff agreed *by opening a Facebook account* to being wiretapped on the Express Scripts website is no more sustainable than it sounds. Defendant has provided neither evidence that Plaintiff did or did not consent to Facebook's terms nor what those terms were. For example, the 83- page Meta Privacy Policy makes no reference to the use of the Facebook pixel. *See* Declaration of Tiffany Cheung ("Cheung Decl."), Exhibit A. Nor do Facebook's Terms of Service, at least those attached to Defendant's motion, make any reference to the use of the Facebook Pixel *See* Cheung Decl., Exh. B. Obviously, more factual development is needed before the parties can usefully engage about the meaning of Meta's policies, whether and how they were communicated to Plaintiff, and whether they have any impact in this litigation.

Disputes over the scope of a privacy policy or whether it adequately discloses the conduct at issue involve questions of fact that cannot be resolved on the pleadings. *See McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021) ("At the motion to dismiss stage, the Court is not prepared to rule that the Privacy Policy establishes an absolute bar to Plaintiff's claims."); *Opperman v. Path, Inc.,* 205 F. Supp. 3d 1064, 1072-73 (N.D. Cal. 2016) (internal quotations omitted) ("[A] reasonable jury could find that Yelp's Privacy Policy provisions do not explicitly address—and thus do not obtain knowing consent for—the uploading of a user's address book data for the purpose of finding friends who are already registered Yelp users"). It would be premature for the Court to make any findings in this regard.

### 3. <u>The Territorial Scope Of The Class Should Be Decided At Class Certification</u>

Defendant's argument regarding the scope of the class under CIPA is premature. Courts routinely recognize that extraterritoriality, like choice of law, is an issue that is properly considered "in the context of a class certification motion and not a motion to dismiss." *Yan Mei Zheng-Lawson v. Toyota Motor Corp.*, 2018 WL 2298963, at *4 (N.D. Cal. May 21, 2018) ("[T]he Court concludes that it would be premature to address those issues at this early stage of the proceedings."); *Fitzhenry-Russell v. Coca-Cola Co.*, 2017 WL 4680073, at *4 (N.D. Cal. Oct. 18, 2017) (deferring ruling on class-related issues "[e]arly in the pleadings stage" is prudent because "neither the court nor the litigants are sure yet which

facts and legal issues are in dispute"); *Precht v. Kia Motors Am., Inc.*, 2014 WL 10988343, at *14 (C.D. Cal. Dec. 29, 2014); *Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564, 572 (N.D. Cal. 2013).

Further, Defendant's argument that the "declaration of policy" under CIPA limits the application of the statute to California residents has been rejected in this district. *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1026 (N.D. Cal. 2011) ("The Court declines to read the statutes' statements of purpose as a limitation on standing when both statutes expressly allow an action to be brought by "any person" or by an "owner or lessee" without imposing any residency requirements."). And to the extent that the Court finds that more specific allegations about the conduct taking place in California are required, Plaintiff can amend to plead that Meta's interceptions took, and take, place in this state.

## IV. DEFENDANT VIOLATED THE CMIA

To state a claim for violation under the CMIA, a plaintiff must show that a "provider of health care . . . disclose[d] medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care plan without first obtaining an authorization. . . ," (Cal. Civ. Code §§ 56.10(a)) and/or did not "maintain[], preserve[], or store[]" medical information in a manner that "preserves the confidentiality of the information contained therein." *Id.* § 56.101. Defendant violated the CMIA by "deploy[ing] Facebook Pixel software on its website" which "surreptitiously intercepted and transmitted in real time to Facebook" the "substance of Plaintiff's and Class Members' electronic communications . . . made during visits to Defendant's website." FAC ¶¶ 83-84, 95. Those communications "identified specific information inputted and content viewed . . . and thus revealed personalized and sensitive information." *Id.* ¶ 98.

### A. Plaintiff Has Alleged His Medical Information Is At Issue

Defendant argues "Plaintiff has not sufficiently alleged the data purportedly transmitted to Facebook constitutes 'medical information' within the meaning of Cal. Civ. Code § 56.05(i)," and that "[a]t most, Plaintiff alleges basic record information was impacted." MTD at 20-21. Not so.

Medical information under the CMIA means "***any individual identifiable information***, in electronic or physical form, ***in the possession of or derived from a provider of health care*** . . . ***regarding a patient's medical history***, mental health application information, mental or ***physical condition or***

***treatment***." Cal. Civ. Code § 56.05(i) (emphasis added). "'Individually identifiable' means that the medical information includes or contains ***any element*** of personal identifying information ***sufficient to allow identification of the individual***, such as the patient's name, address, electronic mail address, telephone number, or social security number or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." *Id.* (emphasis added).

First, Defendant is a health care provider within the meaning of the CMIA. The CMIA defines a "provider of healthcare" to include (1) businesses that are organized to "maintain[] medical information[,]" as well as (2) businesses that (regardless of organizational purpose) offer "software" that is "designed to maintain medical information" to "make the information available to an individual or a provider of healthcare" so that the individual can "manage their information, or for the diagnosis, treatment, or management of a medical condition[.]" § 56.06(b); *see also In re Blackbaud, Inc., Customer Data Breach Litigation*, 2021 WL 3568394, at *8 (D.S.C. Aug. 12, 2021) (explaining that CMIA's incorporation of businesses that employ "software" is to "ensure that the CMIA would apply ***broadly*** to all businesses that maintain medical information "whether or not the business was organized for that purpose") (emphasis added). Defendant here, Express Scripts Holding Company, "is a pharmacy benefits manager" (FAC ¶ 38) and "online pharmacy that" "dispensed more than 1.6 billion prescriptions in the United Stated in 2021." *Id.* ¶¶ 41-42. Accordingly, consumers who "accessed Express Scripts' platform through the website . . . to obtain prescriptions" were "required to enter their name, email address, phone number, address, and payment information" and "to input further information, such as [] date of birth . . . and a diagnosis history related to the [] prescription . . ." *Id.* ¶ 25.

Second, Defendant collects information sufficient to individually identify Plaintiff and Class Members. Courts find that using "Facebook Pixel spyware to intercept … communications" via "cookies named: c_user, datr, fr, and _fbp" and "incorporat[ing] that accessed information into [Facebook] profiles []" amounts to collecting information sufficient to individually identify a person.[4] *Id.* ¶¶ 93, 66, 78.

---

[4] *See*, *e.g.*, . *Sellers v. Bleacher Report, Inc.*, 2023 WL 4850180 at *5 (N.D. Cal., July 28, 2023) ("Although the mode through which the information was transmitted may have been the c_user cookie, the information itself [] is information sufficient to identify a person."); *In re Hulu Priv'y Litigation*, 2014 WL 1724344 at *14 (N.D. Cal., Apr. 28, 2014) ("[t]he Facebook User ID is more than a unique, anonymous identifier. It personally identified a Facebook user. That it is a string of numbers and letters does not alter the conclusion."); *Jackson v. Fandom, Inc.*, 2023 WL 4670285 at *4 (N.D. Cal., July 20, 2023) (finding Plaintiff had plausibly alleged "disclosure of [personally

"Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers including IP addresses, cookies, and device identifiers." FAC ¶ 47. Here, "From the instant a customer accesses Defendant's website, Defendant is … providing Facebook with detailed information about IP addresses, page views, button clicks, and other microdata personally identifiable to the customer." *Id.* ¶ 63. Defendant does this by deploying "cookies named c_user, datr, fr, and fbp (*i.e.,* Facebook Pixel); and Browser attribute information sufficient to fingerprint the patient's device." *Id.* ¶ 32. "The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one—and only one—unique c-user cookie. Facebook uses the c_user cookie to record user activities and communications." *Id.* ¶ 67. Similarly, "the Facebook datr cookie … is an identifier that is unique to the person's specific web browser and is therefore a means of identification for Facebook users." *Id.* ¶ 71.

Alarmingly "the data collected by Defendant identified specific information inputted and content viewed . . . thus reveal[ing] personalized and sensitive information about Plaintiff's and Class Member's internet activity." *Id.* ¶ 98. In fact, for providers like Defendant, "the actions that Facebook Pixel logs include . . . specific communications a patient exchanges at the provider's property, including those relating to specific providers, conditions, and treatments and the timing of such actions, including whether they are made while a patient is still logged-in to a patient portal or around the same time that the patient has scheduled an appointment, called the medical provider, or logged in or out of the patient portal." *Id.* ¶ 132. With each action by Plaintiff, "[t]he Facebook Pixel code selected by Defendant and deployed on its website [began] transmitting [] interactions, actions, inputs, selections, mouse clicks, mouse hovers, mouse movements, and/or keyboard inputs instantly in the first milliseconds that [Plaintiff] accesses Defendant's website." *Id.* ¶ 61.

These cookies allow users to be easily identified. For example, "[a] skilled computer user can obtain the c_user cookie value for any Facebook user by (1) going to the user's Facebook page, (2) right-

---

identifying information]" because plaintiff alleged that "a user's Facebook profile may contain the user's 'name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's post.' [] From these facts, the Court may reasonably infer that an ordinary person could readily identify a specific Facebook user on the basis of a Facebook Profile ID.").

clicking on their mouse, (3) selecting 'View page source,' (4) executing a control-F function for 'fb://profile,' and (5) copying the number value that appears after 'fb://profile' in the page source code of the target Facebook user's page." Alternatively, and even easier, "one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier." *Id.* ¶ 69. For example, "the c_user cookie value for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck." *Id.* ¶ 70.

Third, the information Defendant transmitted is medical information as it regards Plaintiff's "medical history . . . or physical condition or treatment." Cal. Civ. Code § 56.05(i). California courts have interpreted this statutory language to require disclosure of individually identifiable information that has a "substantive" medical treatment nexus, such that merely disclosing individually identifiable information alone, unrelated to medical treatment, is insufficient. *Eisenhower Med. Ctr. v. Superior Ct.,* 226 Cal. App. 4th 430, 435 (2014) ("It is clear from the plain meaning of the statute that medical information cannot mean just any patient-related information held by a health care provider, but must be 'individually identifiable information' and also include 'a patient's medical history, mental or physical condition, or treatment.'").

Here, "Defendant utilized Facebook Pixel spyware to intercept Plaintiff's and [] Class Members' electronic … communications, including how Plaintiff and Class Members interacted with the website, and pages and content viewed while visiting the website. Defendant intentionally tapped and made unauthorized interceptions and connections to Plaintiff and Class Members' electronic communications to read and understand movement on the website, as well as everything Plaintiff and Class Members did on those pages, *e.g.*, what Plaintiff and Class Members searched for, looked at, **the information inputted**, and items clicked on." FAC ¶ 8 (emphasis added).

Defendant relies on *Smith v. Facebook, Inc.,* for the proposition that "Plaintiff's browsing information is not considered 'Protected Health Information' because 'nothing about that information relates specifically to Plaintiffs' health' and the information is general health information that is accessible to the public at large.'" MTD at 21 (quoting *Smith v. Facebook, Inc.,* 262 F. Supp. 3d. 943, 954-55 (N.D. Cal. 2017)). However, unlike *Smith*, the information at issue here is far broader and more intrusive than

the mere fact that a person may have visited and browsed Defendant's website.[5] The information Plaintiff alleges here contains ***specific health information***, including diagnosis history and treatment. Specifically, when Plaintiff "used the same device to access the Express Scripts platform that he used to access his Facebook account . . . [t]o obtain prescriptions to treat low insulin and testosterone levels. . . Plaintiff was required to enter his name, email address, phone number, address, [] payment information[,] . . . date of birth, gender, insurance information, **and a diagnosis history related to [a] testosterone prescription**, as it is a controlled substance." FAC ¶ 25 (emphasis added). Thus, while the fact that a person was merely a customer or visitor may not communicate substantive information, revealing the ***nature*** of the treatment—like inputting a diagnosis history and condition to purchase his prescription—does. As alleged, "[t]he Facebook Pixel code . . . deployed on [Defendant's] website begins transmitting customer interactions, actions, inputs, mouse clicks, mouse hovers, mouse movements and/or keyboard inputs instantly in the first milliseconds that a customer accesses Defendant's website." *Id.* ¶ 61. Moreover, "Facebook expressly admits that the Pixel 'log[s] when someone takes an action' such as 'adding an item to their shopping cart or making a purchase'" like a specific prescription to treat a discrete medical condition. *Id.* ¶ 74.

### B. Plaintiff Plausibly Alleged His Medical Information Was Actually Viewed By A Third Party

Defendant argues "Plaintiff's CMIA claim fails because he fails to allege that his sensitive medical information was *actually viewed by* an unauthorized third party" because "there are *zero* allegations in the amended complaint from which it could be inferred that substantive medical information was actually viewed." MTD at 22. Those contentions are incorrect and premature.

At the pleading stage, "trial courts must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016). "[A] plaintiff must not merely alleged conduct that is conceivable but must instead allege enough

---

[5] *See Colleen M. v. Fertility & Surgical Assocs. of Thousand Oaks*, 132 Cal. App. 4th 1466, 1472 (2005) (distinguishing between disclosing that a person is a patent of a particular healthcare facility and disclosing the nature of the patient's treatment); *see also Cf. Eisenhower Med. Ctr. v. Superior Ct.*, 226 Cal. App. 4th 430, 434-36 (Cal. 2014) (explaining that the compromised information amounted only to "individually identifiable information" because it did not show specific medical concerns or treatments.).

facts to state a claim to relief that is plausible on its face." *Lehman Brothers Holdings, Inc. v. Mason McDuffie Mortgage Corp.,* 2013 WL 76285 at *3 (N.D. Cal., Jan. 4, 2013) (internal citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Here, Plaintiff alleged that "Facebook monetizes the information it receives through the Facebook Pixel deployed on Defendant's Express-Scripts.com website by using it to generate highly-profitable targeted advertising on-and off-Facebook" by engaging in "remarketing based on positive targeting—that is, serving specific ad campaigns to patients based on the specific actions those patients took on Defendant's website." *Id.* FAC ¶¶ 34, 36. Facebook generates "revenue almost entirely from selling targeted advertising to Facebook users on Facebook.com and to all Internet users on non-Facebook sites that integrate Facebook marketing source code on their websites." *Id.* ¶ 49. "The electronic communications Defendant intentionally intercepted were content generated through Plaintiff's use, interaction, and communication with Defendant's website relating to the substance, purport, and/or meaning of Plaintiff's and Class Members' communications with the website." *Id.* ¶ 99. As such, "[t]he data collected by Defendant identified specific information inputted and content viewed and thereafter transmitted the same to Facebook for its aggregation, use, and sale to drive advertising, and thus revealed personalized and sensitive information about Plaintiff's and Class Member's internet activity and habits." *Id.* ¶ 98.

Courts have found allegations similar to Plaintiff's are enough to create an inference that a third party unlawfully and actually viewed Plaintiff and Class Members' medical information. For example, in *In re Solara Medical Supplies, LLC Customer Data Security Breach Litigation*, 613 F. Supp. 3d at 1299, allegations that the plaintiff received an increase in spam emails and phone calls were sufficient to infer that their medical information was viewed as a result of a data breach. *Id.* The same reasoning applied in *In re Mednax Servs., Inc., Customer Data Sec. Breach Litigation*, 603 F. Supp. 3d 1183, 1218 (S.D. Fla. 2022) (sustaining CMIA claim). In another case, the Court determined that since the plaintiff alleged that medical information was "posted . . . on the internet . . . it can be reasonably inferred that someone viewed it." *Stasi v. Inmediata Health Grp. Corp*, 501 F. Supp. 3d 898, 923 (S.D. Cal. 2020). Like in *Stasi*, here

"Plaintiff's and the California Subclass's medical information was viewed by unauthorized third parties, namely Facebook" who "incorporated that accessed information into its profiles of Plaintiff and Class Members" and "on non-Facebook sites that integrate Facebook marketing source code on their websites." FAC ¶¶ 191, 78, 49.

## V. PLAINTIFF HAS ALLEGED A RIGHT OF ACTION UNDER THE CCPA

Defendant initially contends that Plaintiff's CCPA claim fails due to a failure to provide written notice of the alleged CCPA violations prior to filing the action. MTD at 23. Defendant's reliance on the 30-day cure provision is misplaced because Defendant had actual notice of Plaintiff's allegations and the past violations as a result of the unauthorized sharing of Plaintiff's or other Class Members' confidential consumer information. Where, as here, it would be futile to expect a cure, failure to comply with notice-and-cure provisions is excusable and not a basis for dismissal. *See Gueyffier v. Ann Summers, Ltd*., 43 Cal. 4th 1179, 1186 (Cal. 2008); Cal. Civ. Code § 3532 ("The law neither does nor requires idle acts.").

Defendant next asserts that it is not a "business" subject to the CCPA because Defendant is a health care provider regulated by HIPAA and/or the CMIA and thus exempt under the CCPA. MTD at 23-24 (citing Cal. Civ. Code §§ 1798.145(c)(1), 1798.146(a)(2)). However, Defendant Express Scripts Holding Company—the only entity that Plaintiff sued in this lawsuit—"is not a pharmacy or a health care provider." *Gearhart v. Express Scripts, Inc.*, 422 F. Supp. 3d 1217, 1225-26 (E.D. Ky. 2019) (noting that the only Express Scripts-related entity that is a pharmacy and thus arguably a health care provider is Express Scripts Pharmacy, Inc., "a subsidiary of Express Scripts Holding Company"). The entity Express Scripts Holding Company is legally distinct from the pharmacy benefit management and pharmacy entities and is not itself exempt under the CCPA. Simultaneously, Defendant also qualifies as a "business" under the CCPA because it is an entity that shares common control with a legal entity that collects consumers' personal information. *See* Cal. Civ. Code § 1798.140(d)(1)145(c)(1),

Defendant further argues that Section 1798.150 only provides a private right of action if a data breach occurred, *i.e.*, if the consumer's personal information was stolen. MTD at 24. However, Defendant ignores the CCPA's plain language stating that a consumer may bring an action where his "personal information"—which is defined as an individual's name in combination with data that includes "[m]edical information"—"is subject to *an unauthorized access and exfiltration, theft or disclosure*" as a

result of a business's breach of its duty to implement and maintain reasonable security procedures and practices to protect the information. Cal. Civ. Code §§ 1798.150(a), 1798.81.5(d)(1)(A) (emphasis added).

In this case, Plaintiff alleges that Defendant enabled Facebook to track users as they navigate through Defendant's website, and that Plaintiff's and the Class Members' medical information and communications were collected without their consent not just by Defendant but also by Facebook. So, if a patient was a Facebook user, Facebook then linked the information that it receives from the Defendant's website, which included identifying information, to the patient's Facebook profile using a unique identifier. FAC ¶¶ 25-27, 46-78, 105-137. Defendant implemented the tracking software with the knowledge and intent to specifically identify Defendant's patients to Facebook alongside their protected health information and to use this data to target advertisements toward those patients by using an identifier every bit as unique to that user as a Social Security Number. FAC ¶¶ 11, 67, 71, 199. Thus, for these patients (including Plaintiff) Defendant effectively discloses "personal information" to Facebook as defined under the CCPA.

Defendant also falls back on its contention that Plaintiff "consent[ed] to th[is] use of pixel technology on the Express Scripts website." MTD at 24. As previously discussed, Defendant has failed to demonstrate on the basis of the pleadings and any materials referenced or incorporated therein that Plaintiff consented to have personal health information shared with a third party (Facebook) in violation of HIPAA and federal and state wiretapping laws protecting the privacy of consumers. In fact, Plaintiff has plausibly alleged the polar opposite. Defendant's essential argument seems to be that its set of alleged facts wins the day. That is simply not the legal standard upon which this motion to dismiss may be decided.

Defendant further argues that Plaintiff's CCPA claim fails because Plaintiff "does not offer any factual allegations from which it could be inferred that Express Scripts failed to employ reasonable security measures," a requirement of the statute. MTD at 24-25. But this ignores Plaintiff's numerous allegations stating that Defendant failed to maintain such reasonable security measures and practices as a result of knowingly aiding and abetting Facebook by sharing protected personal information without Plaintiff's consent. Under the CCPA, Defendant had a duty to implement and maintain reasonable

security procedures and practices appropriate to the nature of the Plaintiff's and California Subclass Members' personal information to protect said information. Defendants breached the duty it owed to Plaintiff and California Subclass Members by, among other things, failing to prevent the unauthorized dissemination of personally identifiable information (PII) to third parties such as Facebook and the other spyware companies.

Lastly, Defendant asserts that the impacted information in support of Plaintiff's CCPA claim was limited to dates of birth, addresses and similar data that does not constitute "personal information" under the statute. MTD at 25. This ignores the fact that Plaintiff's CCPA claim "re-alleges" and "incorporates by reference," all preceding allegations in the FAC, including that "[t]o obtain prescriptions to treat low insulin and testosterone levels, Plaintiff was required to enter his name, email address, phone number, address, and payment information," and "[h]e was also required to input further information, such as his date of birth, gender, insurance information, and a diagnosis history related to the testosterone prescription, as it is a controlled substance." FAC ¶ 25. This sensitive medical data constitutes "personal information" under the CCPA. *See* Cal. Civ. Code § 1798.81.5(d) (defining "personal information" to mean "[a]n individual's first name or last name or first initial and the individual's last name in combination with" "[m]edical information," which "means any individually identifiable information, in electronic or physical form, regarding the individual's medical history or medical treatment or diagnosis by a health care professional").

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied in its entirety.

Dated: October 11, 2023

**BURSOR & FISHER, P.A.**

By: *<u>/s/ L. Timothy Fisher</u>*

L. Timothy Fisher (State Bar No. 191626)
Jenna L. Gavenman (State Bar No. 348510)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jgavenman@bursor.com

**SWIGART LAW GROUP, APC**
Joshua B. Swigart (State Bar No. 225557)
2221 Camino del Rio S, Suite 308
San Diego, CA 92108
Telephone: (866) 219-3343
Facsimile: (866) 219-8344
E-mail: Josh@SwigartLawGroup.com

**THE BARRY LAW OFFICE, LTD**
Peter F. Barry (MN #0266577)
Admitted pro hac vice
333 Washington Ave No, Suite 300-9038
Minneapolis, MN 55401-1353
Telephone: (612) 379-8800
E-mail: pbarry@lawpoint.com

*Attorneys for Plaintiff*