**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Jenna L. Gavenman (State Bar No. 348510)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
       jgavenman@bursor.com
       jglatt@bursor.com

**THE BARRY LAW OFFICE, LTD**
Peter F. Barry (MN #0266577)
*Admitted pro hac vice*
1422 Asbury Street
St. Paul, MN 55108
Telephone: (612) 379-8800
E-mail: pbarry@lawpoint.com

**SWIGART LAW GROUP, APC**
Joshua B. Swigart (State Bar No. 225557)
2221 Camino del Rio S, Suite 308
San Diego, CA 92108
Telephone: (866) 219-3343
Facsimile: (866) 219-8344
E-mail: Josh@SwigartLawGroup.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JONATHAN LYNCH, individually and on behalf of others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br><br>EXPRESS SCRIPTS HOLDING COMPANY,<br><br>        Defendant. | CASE NO: 3:23-CV-01170-AMO<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:<br><br>1. THE WIRETAP ACT, 18 U.S.C. § 2510 ET SEQ;<br>2. THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PEN. CODE § 631;<br>3. VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE § 56, ET SEQ.<br><br>**JURY TRIAL DEMANDED** |

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-01170-AMO

Deleted: SECOND

Deleted: SECOND

Plaintiff Jonathan Lynch ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Express Scripts Holding Company ("Express Scripts" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.    This is a putative class action lawsuit on behalf of users of Defendant's services, available on its website, www.express-scripts.com (the "Website") and through the Express Scripts mobile application (collectively, the "Express Scripts Platform"), for damages and injunctive relief against Defendant and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, related entities for violations of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.* (the "Wiretap Act") and the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code § 631, in relation to the enabling of unauthorized interception, collection, recording, and dissemination of Plaintiff's and Class Members' sensitive communications and data.

2.    The Federal Legislature passed the Wiretap Act to protect the privacy of the people of the United States.  The Wiretap Act is very clear in its prohibition against intentional unauthorized taping, interception, or disclosure of any wire, oral, or electronic communication.  In addition to other relevant sections, the Wire Tap Act states that any person who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication," has violated the act.  18 U.S.C. § 2511(c).

3.    The California State Legislature passed CIPA to protect the right of privacy of the people of California.  Cal. Penal Code § 631 imposes liability on any person who, "by means of any machine, instrument, or contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "who willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent

Deleted: SECOND

from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

4.     This case stems from the unauthorized interception and disclosure of Plaintiff's and Class Members' sensitive electronic communications with Defendant.  Defendant incorporated Facebook Pixel spyware technology (the "Facebook Pixel") on the Express Scripts Platform, that in turn allowed Meta Platforms, Inc. (f/k/a Facebook, Inc.) ("Facebook" or "Meta"), one of the largest advertising and social media companies in the country, to read, learn the contents of, make reports on Plaintiff's and Class Members' interactions with Defendant's Platform, and use the information for its own benefit.

5.     Plaintiff brings this action for every violation of the Wiretap Act which provides for statutory damages of the greater of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

6.     Plaintiff also brings this action for every violation of California Penal Code § 631 which provides for statutory damages of $5,000 for each violation, pursuant to California Penal Code § 631(a).

7.     As discussed in detail below, Defendant incorporated the Facebook Pixel on its Platform and thus allowed Facebook to contemporaneously intercept and transmit in real time Plaintiff's and the Class Members' electronic computer-to-computer data communications, including how Plaintiff and Class Members interacted with the website, mouse movements and clicks, keystrokes, search items, information inputted into the website, and pages and content viewed while visiting the website.  Defendant intentionally allowed Facebook to tap and make unauthorized interceptions of Plaintiff's and Class Members' electronic communications on its Platform.  Because of Defendant, Facebook was able to read and understand everything Plaintiff and Class Members did on those pages, *e.g.*, what Plaintiff and Class Members searched for, looked at, the information inputted, and items clicked on.

**Deleted:** SECOND

8.    Defendant enabled these unauthorized interceptions and subsequent usage of information collected without knowledge or prior consent of Plaintiff or Class Members.

9.    The Facebook Pixel present on Defendant's Platform is a sophisticated computer software that allows Facebook to contemporaneously intercept, capture, read, observe, re-route, forward, redirect, and receive Plaintiff's and Class Members' electronic communications in real time.

10.    Jonathan Cherki, the CEO of a major spyware company—while discussing the merger of his company with another provider—publicly exposed why companies like Defendant utilize spyware such as the Facebook Pixel to engage in learning the contents of visits to their websites: "The combination of Clicktale and Contentsquare heralds an unprecedented goldmine of digital data that enables companies to interpret and predict the impact of any digital element – including user experience, content, price, reviews and product – on visitor behavior[.]"[1]  Mr. Cherki added that, "this unique data can be used to activate custom digital experiences in the moment via an ecosystem of over 50 martech partners. With a global community of customer and partners, we are accelerating the interpretation of human behavior online and shaping a future of addictive customer experience."[2]

11.    In sum, Defendant illegally enabled Facebook's tapping of, unauthorized connection to, and interception of Plaintiff's and Class Members' private electronic communications with Defendant's Platform.  Defendant's actions thus caused injuries, including violations of Plaintiff's and Class Members' substantive legal privacy rights under the Wiretap Act and CIPA.

**JURISDICTION AND VENUE**

12.    This Court has personal jurisdiction over Defendant because it has sufficient minimum contacts with this District in that it operates and markets its services throughout the country and in this District.

---

[1] https://www.prnewswire.com/news-releases/contentsquare-acquires-clicktale-to-create-the-definitive-global-leader-in-experience-analytics-300878232.html.

[2] *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT                                3
CASE NO. 3:25-CV-01170-AMO

Deleted: .

Deleted: SECOND

13. Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because this action arises out of Defendant's violations of the Wiretap Act, 18 U.S.C. §2510 *et seq.*

14. Jurisdiction is also established under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because Plaintiff, a citizen of the State of California, seeks relief on behalf of (1) a national class and (2) a California subclass, which will result in at least one Class Member belonging to a different state than Defendant, a Delaware Corporation with its principal place of business in St. Louis, Missouri.

15. Plaintiff is requesting statutory damages of the greater of $10,000 or $100 per day for each violation of 18 U.S.C. §2510, *et seq.* and $2,500 per violation of Cal. Penal Code §631, which when aggregated among a proposed class number in the hundreds of thousands, exceeds the $5,000,000 threshold for federal court jurisdiction under CAFA.

16. Therefore, both diversity jurisdiction and the damages threshold under CAFA are present, and this Court has jurisdiction.

17. Because Defendant conducts business within the State of California, personal jurisdiction is established.

18. This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. §1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

19. Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendant conducted business within this judicial district at all times relevant.

## PARTIES TO THE LITIGATION

20. **Plaintiff Jonathan Lynch** is a California citizen. Plaintiff used the Express Scripts Platform on multiple occasions between April 2022 and December 2022 to obtain prescriptions to treat low insulin and testosterone levels. Plaintiff accessed Express Scripts' Platform through the website on his computer. During the time Plaintiff used the Express Scripts Platform, he maintained a Facebook account. Plaintiff used the same device to access the Express Scripts Platform that he used to access his Facebook account. To obtain his prescriptions, Plaintiff was

THIRD AMENDED CLASS ACTION COMPLAINT                                          4
CASE NO. 3:25-CV-01170-AMO

Deleted: SECOND

required to enter his name, email address, phone number, address, and payment information.  He was also required to input further information, such as his date of birth, gender, insurance information, and a diagnosis history related to the testosterone prescription, as it is a controlled substance.  Unbeknownst to Plaintiff, Defendant aided and employed the Facebook Pixel throughout its Platform.  The Facebook Pixel tracked Plaintiff's use of Defendant's Platform, and then communicated Plaintiff's confidential information to Facebook without Plaintiff's consent.  Plaintiff's use of Defendant's Platform included the time during which the Facebook Pixel was secretly deployed throughout the Express Scripts Platform.  Plaintiff did not consent to the sharing and interception of his private, sensitive medical data.  Had Plaintiff known Express Scripts aided and employed the Facebook Pixel to monitor and share his personal information and other sensitive information with third parties, namely Facebook, including for advertising and other undisclosed purposes, he would never have used the Platform or shared his information with Express Scripts.

21.     **Defendant Express Scripts Holding Company** ("Defendant") is a Delaware corporation headquartered at One Express Way, St. Louis, MO 63121 and does business throughout the United States, deriving substantial revenue from interstate commerce.

<u>**DEFENDANT'S USE OF FACEBOOK PIXEL**</u>

22.     Plaintiff brings this action on behalf of himself and other Americans whose privacy has been violated by Defendant's use of the Facebook's Pixel.  As explained herein, Defendant knew (or should have known) that its aiding and employing of the Facebook Pixel on its Platform would result in the wrongful, contemporaneous interception, recording, and re-direction of private communications to Facebook.  This unlawful collection of data is done without consent or authorization by users of Defendant's Platform, like Plaintiff, in violation of federal and state laws.

23.     Unbeknownst to Plaintiff, and millions of other persons around the country, when Plaintiff accessed Defendant's Platform, the Facebook Pixel secretly deployed on the Platform sent the fact that he had clicked to sign-in to that website to Facebook.

24.     According to Facebook, the kinds of data that the Facebook Pixel causes to be re-directed from Plaintiff's computing device to Facebook are explained as follows:[3]

---

[3] https://www.facebook.com/off_facebook_activity/.

Deleted: was

Deleted: used to communicate

Deleted: monitoring

Deleted: use

Deleted: SECOND

> We receive activity from businesses and organizations who use our business tools so they can better understand how their website, app or ads are performing.  We use your activity to show you relevant ads and to suggest things you might be interested in.
>
> Examples of interactions include:
>
> •Opened an app
> •Logged into app with Facebook
> •Visited a website
> •Searched for an item
> •Added an item to a wishlist
> •Added an item to a cart
> •Made a purchase
> •Made a donation
>
> Businesses and organizations can also send custom interactions that meet certain needs.  For example, they may use a custom interaction to create a unique group of customers in order to show them relevant ads.
>
> **Sensitive information is prohibited**
> We prohibit businesses and organizations from sharing sensitive information with us, including health and financial data.  If we determine that a business or an organization is violating our terms, we will take action against that business or organization.

25. By aiding and employing the Facebook Pixel on its Platform, Defendant aided Facebook's interception of Plaintiff's information, surreptitiously and without consent, including the fact that Plaintiff was communicating with Defendant via its Platform.

26. That activity information was intercepted and disclosed to Facebook each time Plaintiff accessed the Platform, without his prior knowledge or consent.

27. The Facebook Pixel is a snippet of JavaScript code that loads a library of functions which developers can use to track actions users take on their sites.  Facebook catalogues and keeps records of users through identifiers.  These identifiers collected information about Plaintiff and his device.  The Facebook Pixel identifiers include cookies named c-user, datr, fr, and fbp (*i.e.*, Facebook Pixel); and Browser attribute information sufficient to fingerprint the patient's device.  Every time the Facebook Pixel logs an action on a third-party website (like Defendant's), it sends the data back to its parent: Meta.  With that information, Meta then attempts to match the action to one of its users with Facebook accounts.

THIRD AMENDED CLASS ACTION COMPLAINT                    6
CASE NO. 3:25-CV-01170-AMO

28.     The same disclosures occurred for people around the country when they accessed Defendant's Platform.

29.     Facebook monetizes the information it receives through the Facebook Pixel deployed on Defendant's Platform by using it to generate highly profitable targeted advertising on-and-off Facebook.

30.     The targeted advertising Facebook offers for sale includes the ability to target persons based on specific actions that a person has taken on websites like Defendant's, using information gathered by the Facebook Pixel.  This allows Facebook to create a "dossier" on users to effective targeting advertising.

31.     The Facebook Pixel data unlawfully shared also offers the ability to engage in remarketing based on positive targeting—that is, serving specific ad campaigns to users based on the specific actions those patients took on Defendant's Platform.

32.     Defendant's actions described herein give rise to causes of action for: (1) federal and state electronic communications privacy and wiretap claims; and (2) the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632.

**FACTS SPECIFIC TO DEFENDANT**

33.     Defendant is a pharmacy benefits manager serving over 100 million Americans.[4]

34.     Defendant is publicly traded on the NASDAQ as Express Scripts Holding Co (ticker symbol ESRX) and had gross revenues of more than $25 billion in 2018.[5]

35.     Defendant handled 25% of all pharmacy benefit management business in the United States in 2021.[6]

---

[4] *See* https://www.express-scripts.com/corporate/about (last accessed February 20, 2023).

[5] *See* https://www.investing.com/equities/express-scripts-inc-income-statement (last accessed February 20, 2023).

[6] *See* https://www.managedhealthcareexecutive.com/view/beyond-the-big-three-pbms (last accessed February 20, 2023).

THIRD AMENDED CLASS ACTION COMPLAINT                                                                7
CASE NO. 3:25-CV-01170-AMO

Deleted: SECOND

36.     Defendant is also an online pharmacy that handles millions of prescriptions each year through the Express Scripts Pharmacy.[7]

37.     Defendant dispensed more than 1.6 billion prescriptions in the United States in 2021.[8]

38.     There are approximately 48,524 Express Scripts locations in the United States as of June 22, 2022, with 4,848 California locations.[9]

39.     On August 6, 2021, The U.S. Department of Defense awarded Defendant an exclusive contract for the administration of the TRICARE Pharmacy Program, Fifth Generation, which will serve 9.6 million active-duty service members, their family members, and retirees through 2029, including all of those in California.[10]

40.     As of September 2021, there were 217,889 active-duty and reserve members of the military in California served by Defendant's pharmacy benefit management service.[11]

**HOW FACEBOOK PIXEL WORKS**

41.     Facebook operates the world's largest social media company.

42.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers including IP addresses, cookies, and device identifiers.

43.     Facebook also tracks non-users across the web through its widespread Internet marketing products and source code.

---

[7] *See* https://www.express-scripts.com/frequently-asked-questions/about (last accessed February 20, 2023).

[8] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/1739940/000173994022000007/ci-20211231.htm (last accessed February 20, 2023).

[9] *See* https://www.scrapehero.com/location-reports/Express%20Scripts-USA/ (last accessed February 20, 2023).

[10] *See* https://www.bloomberg.com/press-releases/2021-08-06/express-scripts-awarded-7-year-tricare-pharmacy-program-contract (last accessed February 20, 2023).

[11] *See* https://www.governing.com/now/2021-military-active-duty-personnel-civilians-by-state (last accessed February 20, 2023).

THIRD AMENDED CLASS ACTION COMPLAINT                                              8
CASE NO. 3:25-CV-01170-AMO

Deleted: SECOND

44. Facebook's revenue is derived almost entirely from selling targeted advertising space on Facebook.com, and to all Internet users on non-Facebook sites that integrate Facebook marketing source code on their websites.

45. Facebook Business is the division that provides advertising services to developers. Facebook Business and the advertising tools it provides to developers are focused on trade and commerce.

46. The Facebook Pixel, a product for Facebook Business, is a "piece of code" that lets developers "measure, optimize and build audiences for … ad campaigns."[12]

47. The Facebook Pixel is an invisible 1x1 web bug that Facebook makes available to web-developers like Defendant to help track ad-driven activity from Facebook and others on their website.

48. Key features of the Facebook Pixel include its ability to help developers like Defendant to: (a) "Measure cross-device conversions" and "understand how your cross-device ads help influence conversion;" (b) "Optimize delivery to people likely to take action" and "ensure your ads are shown to the people most likely to take action;" and (c) "Create custom audience from website visitors" and create "dynamic ads [to] help you automatically show website visitors the products they viewed on your website – or related ones."[13]

49. Facebook describes the Facebook Pixel as "a snippet of Javascript code" that "relies on Facebook cookies, which enable [Facebook] to match … website visitors to their respective Facebook User accounts."[14]

50. Facebook provides simple instructions for developers like Defendant to set up the Facebook Pixel, creates the Facebook code for each developer who installs it, and recommends that the Facebook Pixel code be placed early in the source code for any given webpage or website to ensure that the user will be tracked.

---

[12] https://www.facebook.com/business/learn/facebook-ads-pixel.

[13] *Id.*

[14] *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT                                        9
CASE NO. 3:25-CV-01170-AMO

Deleted: SECOND

51.     By executing the code immediately, Facebook has designed the Facebook Pixel such that Facebook receives the information about customer actions on Defendant's website properties contemporaneous with their making.

52.     As soon as an Express Scripts user takes any action on the Platform—such as clicking a button to register, login, or logout of the customer portal—Facebook's source code commands the customer's computing device to re-direct the content of the customer's communication to Facebook while the exchange of the communication between the customer and Defendant is still occurring.

53.     The Facebook Pixel code selected by Defendant and deployed on its Platform begins transmitting customer interactions, actions, inputs, selection, mouse clicks, mouse hovers, mouse movements, and/or keyboard inputs instantly in the first milliseconds that a customer accesses Defendant's Platform.

54.     Defendant has engineered and coded its website such that no human being could possibly, find, observe, and select—let alone read—the website's terms of use or privacy policy and either be made aware of or consent to such interception designed by Defendant.

55.     From the instant a customer accesses Defendant's Platform, the Facebook Pixel is flooding Facebook with information about that customer's visit, providing Facebook with detailed information about IP addresses, page views, button clicks, and other microdata personally identifiable to the customer.

56.     By Defendant's design, Facebook receives the content of a customer's portal sign-in communication immediately after the customer clicks the log-in button and even before Defendant receives it.

57.     The content of the user's communications with Defendant are re-directed to Facebook while the communications are still occurring.

58.     The cookies that Facebook identifies users with include, but are not necessarily limited to, cookies named: c_user, datr, fr, and _fbp.

59.     The c_user cookie is a means of identification for Facebook users that Defendant employs on its website.  The c_user cookie value is the Facebook equivalent of a user identification

THIRD AMENDED CLASS ACTION COMPLAINT                                                    10
CASE NO. 3:25-CV-01170-AMO

Deleted: SECOND

number.  Each Facebook user account has one— and only one—unique c_user cookie.  Facebook uses the c_user cookie to record user activities and communications.

60.    A skilled computer user can obtain the c_user cookie value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking on their mouse, (3) selecting 'View page source,' (4) executing a control-F function for "fb://profile," and (5) copying the number value that appears after "fb://profile" in the page source code of the target Facebook user's page.

61.    It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier.

62.    For example, the c_user cookie value for Mark Zuckerberg is 4.  Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

63.    The Facebook datr cookie identifies the person's specific web browser from which the person is sending the communication.  It is an identifier that is unique to the person's specific web browser and is therefore a means of identification for Facebook users.

64.    Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

65.    Any Facebook user can view the specific datr cookie identifiers that Facebook has associated with their account by using the Facebook Download Your Information tool.

66.    Facebook expressly admits that the Facebook Pixel "log[s] when someone takes an action" such as "adding an item to their shopping cart or making a purchase."

67.    The Facebook fr cookie is an encrypted combination of the c_user and datr cookies.[15]

---

[15] *See* Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission, Mar. 27, 2015, available at https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

THIRD AMENDED CLASS ACTION COMPLAINT                                           11
CASE NO. 3:25-CV-01170-AMO

Deleted: SECOND

68. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Pixel. The _fbp cookie is a Facebook cookie that masquerades as a first-party cookie to evade third party cookie blockers and share data more directly between a website that has deployed Facebook Pixel and Facebook.[16]

69. To deploy the Facebook Pixel software, website developers like Defendant simply copy-paste the Facebook Pixel code that Facebook creates to their web page.

70. Through the Facebook Pixel embedded in Defendant's website, Facebook was able to and did access sensitive personal and health information provided by Plaintiff and Class Members to Express Scripts, and incorporated that accessed information into its profiles of Plaintiff and Class Members.

**FACTS SPECIFIC TO PLAINTIFF AND CLASS MEMBERS**

71. On multiple occasions between April 2022 and December 2022, Plaintiff accessed Defendant's Platform.

72. Plaintiff was in California during Plaintiff's visits to Defendant's Platform.

73. Plaintiff accessed Defendant's Platform via a personal computer using hardwired internet access.

74. Unbeknownst to Plaintiff, Defendant deployed—and so aided—the Facebook Pixel software on its Platform to collect and transmit in real time to a third party, Facebook, the contents of communications while the same are in transit.

75. Defendant installed and configured the Facebook Pixel on its Platform in a manner that permitted Facebook to contemporaneously intercept and transmit Plaintiff's private communications in real time. Specifically, Defendant's deployment of the Facebook Pixel caused Plaintiff's interactions with the Platform—including actions such as clicking buttons, navigating pages, and entering sensitive information including search terms—to be automatically and invisibly redirected to Facebook's servers as those interactions occurred, without Plaintiff's knowledge or consent. Defendant exercised full control over the configuration and deployment of the Facebook

---

[16] https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

**Deleted:**

**Deleted:** <#>The Facebook Pixel thereafter surreptitiously intercepted and transmitted in real time to Facebook, without Plaintiff's prior knowledge or consent, a variety of private communications between Plaintiff and Defendant.¶

**Deleted:** SECOND

Pixel and selected settings that caused the Facebook Pixel to intercept and transmit confidential user communications to Facebook contemporaneously and without user authorization.

76.    These private communications included items such as page views, button clicks, names of buttons clicked, microdata, mouse clicks, mouse hovers, scrolling, and other observable website interactions, selections, and communications.

77.    During visits to the Platform, Plaintiff and Class Members, through computers and/or mobile devices, transmitted electronic communications to Defendant.  The communications were recorded by the Facebook Pixel and sent to Facebook as messages indicating what content was being viewed, clicked on, requested and/or inputted by Plaintiff and Class Members.  These communications included, but were not limited to, the following actions taken by Plaintiff and Class Members while using Defendant's Platform: mouse clicks and movements, keystrokes, search items, information inputted, pages and content viewed, scroll movements, and copy and paste actions.

78.    Plaintiff and Class Members reasonably expected that visits to Defendant's Platform would be private, and that Defendant would not be enabling the interception or tapping of their communications with Defendant's Platform, particularly because Defendant failed to present Plaintiff and Class Members with a pop-up disclosure or consent form alerting Plaintiff that the visits to the Platform were monitored, recorded, and shared via the Facebook Pixel.

79.    Plaintiff and Class Members reasonably believed their interactions with Defendant's Platform were private and would not be monitored live while Plaintiff and Class Members were using the Platform.

80.    On information and belief, during all times relevant to this action, Defendant has had the Facebook Pixel embedded within its Platform code.

81.    The Facebook Pixel is not a provider of wire or electronic communication services, or an internet service provider.

82.    The Facebook Pixel was not instrumental or necessary to the operation or function of Defendant's Platform or business.

83.    Defendant caused the interception by Facebook of Plaintiff's electronic communications by enabling the Facebook Pixel to contemporaneously intercept and transmit

THIRD AMENDED CLASS ACTION COMPLAINT                                                    13
CASE NO. 3:25-CV-01170-AMO

| Deleted: | Defendant's use of |
| Deleted: | Pixel to intercept |
| Deleted: | share them with Facebook |
| Deleted: | SECOND |

Plaintiff's interactions on the Platform to Facebook. This software integration was neither instrumental nor necessary to Defendant's provision of any goods or services. Rather, the level and detail of information surreptitiously collected by the Facebook Pixel and shared to Facebook indicates that the only purpose was to gain an unlawful understanding of the habits and preferences of users of Defendant's Platform. The information collected was solely for Defendant's and Facebook's own marketing and advertising benefits.

84.     During Plaintiff's and Class Members' visits to Defendant's Platform, Defendant intentionally deployed and configured the Facebook Pixel on its Platform in a manner that enabled Facebook to intercept the substance of Plaintiff's electronic communications as those communications occurred. As a direct result of Defendant's implementation, Facebook captured in real time Plaintiff's mouse clicks, keystrokes, search terms, content viewed, and other interactions with the Platform including confidential and personally identifiable information, such as prescription-related activity, personal inputs, and interaction metadata.

85.     The relevant facts regarding the full parameters of the communications intercepted and transmitted by the Facebook Pixel and the extent of how the connections occurred are solely within the possession and control of Defendant and Facebook.

86.     The Facebook Pixel aided and employed by Defendant on its website is not a website cookie, standard analytics tool, web beacon, or other similar technology.

87.     Unlike harmless collection of an internet protocol address, the data intercepted and collected by the Facebook Pixel concerned specific content information inputted and content viewed, and transmitted the same to Facebook in real time for its aggregation, use, and sale to drive advertising. Information shared revealed personalized and sensitive information about Plaintiff's and Class Member's internet activity and habits.

88.     The electronic communications intentionally intercepted by the Facebook Pixel and transmitted to Facebook were content generated through Plaintiff's use, interaction, and communication with Defendant's Platform relating to the substance, purport, and/or meaning of Plaintiff's and Class Members' communications with the Platform.

THIRD AMENDED CLASS ACTION COMPLAINT                                                                14
CASE NO. 3:25-CV-01170-AMO

**Deleted:** not

**Deleted:** or

**Deleted:** of its

**Formatted:** Font: 14 pt

**Deleted:** , and the

**Deleted:** benefit

**Deleted:** utilized

**Deleted:** and Class Members'

**Deleted:** intentionally and contemporaneously share the information with Facebook, including

**Deleted:**  and movements

**Deleted:** information inputted, pages

**Deleted:** content viewed, scroll movements, and copy and paste actions.  In other words, Defendant enabled Facebook's tapping and unauthorized connections to the electronic communications of Plaintiff and Class Members made during visits to Defendant's Platform. …

**Deleted:** utilized

**Deleted:** identified

**Deleted:** SECOND

89.  The electronic communications intercepted and transmitted by the Facebook Pixel were not generated automatically and were not incidental to other consumer communications.

90.  The Facebook Pixel—which Defendant installed and employed on its website—allows Facebook to intercept, tap, make unauthorized connections and transmit communications in real time, which allowed Facebook to learn the contents of communications of Plaintiff and Class Members in a manner that was undetectable to them.

91.  Defendant—by employing the Facebook Tracking Pixel on its website—aided it to, in real time, read, learn, and/or attempt to learn, the contents of the transmissions of the communications to Facebook for its business purposes.

92.  Defendant never sought consent and Plaintiff and Class Members never provided consent for Facebook's unauthorized access to their electronic communications.  Plaintiff and Class Members thus did not have a reasonable opportunity to discover Defendant's unlawful and unauthorized enabling of Facebook's activity.

**FACEBOOK PIXEL EAVESDROPPING ON DEFENDANT'S PLATFORM**

93.  Using third party publicly available software, Plaintiff has been able to analyze the web traffic between a computer and a website with which it is interacting.

94.  This third-party software monitors and records all inbound and outbound data requests made by a website in a user's browser.

95.  Testing was done between a standard Google Chrome Browser and Defendant's Platform with this third-party software running in the background.

96.  During these tests, this third-party software reported that Defendant's Platform affirmatively interacted in the background with Facebook servers at least 16 times, 3 of which were connections to Facebook servers and 13 were "GET" requests from Facebook servers.

97.  On information and belief, Defendant's Platform repeatedly and continuously communicates private data to Facebook about Plaintiff and Class Members during, at the very least, its signup process, including the name of the person signing up, date of birth, zip code, button text clicked, IP address, exact URL referred, and other personally identifiable information.

THIRD AMENDED CLASS ACTION COMPLAINT                                                15
CASE NO. 3:25-CV-01170-AMO

Deleted: incorporated on Defendant's Platform intercepted, tapped,…

Deleted: made

Deleted: Defendant enabled the real time transmission

Deleted: SECOND

98. The interception and transmission to Facebook by the Facebook Pixel employed on Defendant's Platform occurs simultaneously without the user's knowledge or awareness.

99. Defendant's aiding and employing of Facebook's eavesdropping on Plaintiff's and Class Members' private communications with Defendant happens well before the user of the website is ever presented any clickable links to a privacy policy or terms of service.

**COMMUNICATIONS WITH EXPRESS SCRIPTS ARE CONFIDENTIAL BY NATURE**

100. Patient health care information in the United States is protected by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations promulgated by the United States Department of Health and Human Services ("HHS").

101. The HIPAA Privacy Rule establishes:

> [N]ational standards to protect individuals' medical records and other individually identifiable health information (collectively defined as "protected health information") and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically. The Rule requires appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization. The Rule also gives individuals rights over their protected health information, including rights to examine and obtain a copy of their health records, to direct a covered entity to transmit to a third party an electronic copy of their protected health information in an electronic health record, and to request corrections. The Privacy Rule is located at 45 CFR Part 160 and Subparts A and E of Part 164.

https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

102. Under 45 C.F.R. § 164.502, a health care provider or business associate of a health care provider "may not use or disclose 'protected health information' except as permitted or required by" the HIPAA Privacy Rule.

103. Under 45 C.F.R. 160.103, the Privacy Rule defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

104. Under 45 C.F.R. § 160.103, the Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information

Deleted: enabling

Deleted: SECOND

collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

105.   HHS has previously instructed that HIPAA covers patient-status alone:

"The sale of a patient list to a marketing firm" is not permitted under HIPAA.  65 Fed. Reg. 82717 (Dec. 28, 2000);

"A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which would include disclosure of mere patient status through a patient list.  67 Fed. Reg. 53186 (Aug. 14, 2002);

It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1).  Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

106.   There is no HIPAA-exception for the Internet or online patient portals.

107.   Defendant, as a pharmacy benefits manager and online pharmacy, collects information from users that qualifies as individually identifiable health information.  The nature of information shared by Express Scripts users is exclusively related to patient status and health information.

108.   Defendant did not procure HIPAA authorizations from the Plaintiff or other members of the class for the disclosure of patient status and health information to Facebook.

109.   On webpages that employ the Facebook Pixel, the source code causes the exact content of the patient's communication with their health care provider to be intercepted by

**Deleted:** SECOND

Facebook and re-directed instantly and in real time to Facebook in a fashion that identifies them as a patient.

110.    Facebook consistently creates marketing campaigns with information obtained from medical portals that disclose patient identities and their individually identifiable health information to Facebook, for the purpose of targeted marketing based on patient communications with their medical portals.

## CLASS ACTION ALLEGATIONS

111.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

**Nationwide Class**
All natural persons in the United States who used the Express Scripts Platform and whose communications and/or data were shared with third parties, including Facebook.

In addition, or in the alternative, Plaintiff pleads the following State Subclass:

**California Subclass**
All natural persons in the State of California who used the Express Scripts platform and whose communications and/or data were shared with third parties, including Facebook.

112.    Excluded from each Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiff reserves the right to redefine each Class and to add subclasses as appropriate based on discovery and specific theories of liability.

113.    **Numerosity**: The exact number of Class Members is currently unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable.  The Class likely consists of millions of individuals, and Members can be identified through Express Scripts' records.

Deleted: SECOND

THIRD AMENDED CLASS ACTION COMPLAINT                                      18
CASE NO. 3:25-CV-01170-AMO

114. **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members, including, but not limited to:

    a.    Whether Defendant violated Plaintiff's and Class Members' privacy rights;

    b.    Whether Defendant's acts and practices violated the Common Law Invasion of Privacy;

    c.    Whether Defendant was unjustly enriched;

    d.    Whether Defendant's acts and practices violated California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;

    e.    Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

    f.    Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and

    g.    Whether Plaintiff and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

115. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. The claims of Plaintiff and Class Members arise from the same conduct by Defendant and are based on the same legal theories.

116. **Adequacy**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interests that are antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class Members, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of other Class Members.

117. **Predominance**: Questions of law or fact common to the Class Members predominate over any questions affecting only individual members of each Class. The elements of the legal claims brought by Plaintiff and Class Members are capable of proof at trial through evidence that is common to each Class rather than individual to its members.

118. **Superiority**: A class action is a superior method for the fair and efficient adjudication of this controversy because:

    a.    Class-wide damages are essential to induce Defendant to comply with Federal

**Deleted:** SECOND

and California law.

b.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.

c.  Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

d.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

e.  Class action treatment is manageable because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would endanger.

f.  Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.

119.  Plaintiff and the Class Members have suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods because as individual Class Members have no way of discovering that Defendant affirmatively enabled Facebook to intercept and record Plaintiff's and Class Members' electronic communications in real time by integrating and configuring the Facebook Pixel into its Platform. Through this implementation, Facebook—not Defendant—carried out the actual interception by capturing and transmitting users' communications as they occurred, all without Plaintiff's knowledge or consent.

120.  Each Class may also be certified because:

a.  The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant;

b.  The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.  Defendant has acted, or refused to act, on grounds generally applicable to each Class, thereby making appropriate final and injunctive relief with respect to the members of each Class as a whole.

THIRD AMENDED CLASS ACTION COMPLAINT                                    20
CASE NO. 3:25-CV-01170-AMO

Deleted: intercepted

Deleted: recorded the

Deleted: Member's

Deleted: Class Members'

Deleted: SECOND

121.    The joinder of Class Members is impractical and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.  The Class Members can be identified through Defendant's records.

**TOLLING**

122.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the misrepresentations and omissions alleged herein.  Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

123.    Plaintiff and Class Members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was acting unlawfully and in the manner alleged herein.  As alleged herein, the representations made by Defendant were material to Plaintiff and Class Members at all relevant times.  Within the time period of any applicable statutes of limitations, Plaintiff and Class Members could not have discovered through the exercise of reasonable diligence the alleged wrongful conduct.

124.    Defendant knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein.  Plaintiff and Class Members reasonably relied on Defendant's concealment.

125.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

**CAUSES OF ACTION**

**COUNT I**
**Violation Of The Wiretap Act**
**18 U.S.C. § 2510 *et seq.***

126.    Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

Deleted: SECOND

127.    The Wiretap Act, as amended by the Electronic Communications and Privacy Act of 1986, prohibits the intentional interception of any wire, oral, or electronic communication.

128.    Under 18 U.S.C. § 2520(a) there is a private right of action to any person whose wire, oral, or electronic communication is intercepted.

129.    Defendant intentionally configured its Platform to facilitate Facebook's real-time interception of Plaintiff's and Class Members' electronic communications. Defendant's implementation of the Facebook Pixel caused Facebook to contemporaneously capture and redirect those intercepted communications from users to Facebook, as they occurred on the Platform.

130.    Plaintiff and Class Members were unaware Defendant was enabling Facebook to intercept and transmit their electronic communications in real time through the Facebook Pixel and tracking their communications and interactions with Defendant's Platform.

131.    Defendant intentionally employed technology—the Facebook Pixel—that enabled Facebook to intercept, transmit in real time, and acquire the contents of Plaintiff's and Class Members' electronic communications, in violation of 18 U.S.C. § 2511.

132.    Plaintiff and Class Members are persons whose electronic communications were intercepted by Facebook, as a consequence of Defendant's enabling.  As such, they are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each violation, actual damages, punitive damages, and reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

**COUNT II**
**Unlawful Wiretapping and Interception of Electronic Communication**
**California Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

133.    Plaintiff pleads this claim in the alternative individually and on behalf of the California Subclass.

134.    Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

135.    Defendant aided or employed the interception of components of Plaintiff's and Class Members' private electronic communications and transmissions by a third party—specifically,

THIRD AMENDED CLASS ACTION COMPLAINT                                    22
CASE NO. 3:25-CV-01170-AMO

Deleted: enabled Facebook

Deleted: intercept

Deleted:  without consent when Plaintiff

Deleted: Class Members navigated through Defendant's Platform.

Deleted: enabled

Deleted: -

Deleted: SECOND

Facebook—when Plaintiff and other Class Members accessed Defendant's Platform from within the State of California. Defendant knowingly configured and deployed the Facebook Pixel in a manner that affirmatively enabled Facebook to act as the direct interceptor of those communications in real time. Facebook intercepted, captured, read, and used the contents of these communications, which included confidential, personally identifiable, and medical-related data provided by Plaintiff and Class Members during their interactions with Defendant's Platform, as they occurred, and Defendant's conduct constituted knowing facilitation and substantial assistance in that unlawful interception. These interceptions occurred while the communications were still in transit between Plaintiff and Defendant's Platform, as Facebook received the data before it was fully delivered to or processed by Defendant.

136.    Plaintiff and Class Members were completely unaware that Defendant had aided or employed the Facebook Pixel to intercept and transmit electronic communications and other personal data to Facebook until well after it had already occurred and were therefore unable to consent.

137.    Defendant never advised Plaintiff or the other Class Members that any part of their communications or use of Defendant's Platform would be tapped and thereafter delivered to the third-party, Facebook.

138.    To establish liability under section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner" does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

THIRD AMENDED CLASS ACTION COMPLAINT                                23
CASE NO. 3:25-CV-01170-AMO

**Deleted:** ,

**Deleted:** assisted a third-party,

**Deleted:** ,

**Deleted:** store

**Deleted:** SECOND

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

139.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F. 3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

140.    The California Supreme Court has held that "Section 631 was aimed at one aspect of the privacy problem—eavesdropping, or the secret monitoring of conversations by third parties." *Ribas v. Clark*, 38 Cal. 3d 355, 359 (1985) (citation omitted).

141.    "California courts interpret 'eavesdrop,' . . . to refer to a third party secretly listening to a conversation between two other parties." *Thomasson v. GC Servs. Ltd. P'ship*, 321 F. App'x 557, 559 (9th Cir. 2008).

142.    Defendant's employment of the Facebook Pixel on its Platform is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here, namely, enabling the secret interception of private communications by Facebook, the eavesdropping third-party.

143.    As a third-party software vendor, Facebook was not merely recording these secret communications between Plaintiff and the Class Members and Defendant for Defendant's later review and use.

THIRD AMENDED CLASS ACTION COMPLAINT                                         24
CASE NO. 3:25-CV-01170-AMO

Deleted: , 2020 WL 1807978

Deleted: Apr. 9,

Deleted: SECOND

144. Rather, Facebook was enabled in its eavesdropping by Defendant's knowing use of the Facebook Pixel which was harvesting private communications and data for Facebook's own profit.

145. By employing the Facebook Pixel, Defendant enabled a third-party, Facebook, to willfully and without consent, intercept, read or attempt to read or learn the contents or meaning of electronic communications of Plaintiff and putative Class Members, while the electronic communications were in transit or passing over a wire, line or cable or were being sent from or received at a place in California.

146. Plaintiff and Class Members did not consent to any of Defendant's actions in enabling these unauthorized eavesdropping connections by Facebook, nor have Plaintiff or Class Members consented to Defendant's enabling of Facebook's intentional access, interception, reading, learning, recording, eavesdropping, and collection of Plaintiff's and Class Members' electronic communications.

147. Plaintiff's and the Class Members' devices to which Defendant enabled access to by a third-party through its unauthorized actions included their computers, smart phones, and tablets and/or other electronic computing devices.

148. Defendant violated Cal. Penal Code § 631 by enabling a third-party, Facebook, in knowingly eavesdropping on and accessing, without permission, Plaintiff's and Class Members' electronic communications through the use of the Facebook Pixel in order for Facebook to track, understand, and attempt to learn the contents of Plaintiff's and Class Members' electronic communications generated by the use of Defendant's Platform.

149. Defendant violated Cal. Penal Code § 631 by knowingly and without permission enabling the interception, eavesdropping, wiretapping, accessing, taking, and using Plaintiff's and the Class Members' communications by the third-party Facebook.

150. Plaintiff and Class Members seek relief available under Cal. Penal Code § 631, including $2,500 per violation against Defendant for such enabling of eavesdropping by a third-party, Facebook.

Deleted: attempted

Deleted: in

Deleted: SECOND

**COUNT III**
**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

151. Plaintiff pleads this claim in the alternative individually and on behalf of the California Subclass.

152. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

153. Defendant is a provider of healthcare within the meaning of Civil Code § 56.06(a) and maintains medical information as defined by Civil Code § 56.05, because the Express Scripts Platform maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, or for the diagnosis, treatment, or management of a medical condition.

154. Express Scripts is therefore subject to the requirements of the CMIA and obligated under Section 56.06 subdivision (e) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of users.

155. The CMIA defines medical information to mean any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." As explained above, the information Express Scripts maintained and disclosed is medical information because it is identifiable information relating to patient's medical histories, conditions, treatments, and prescriptions.

156. Express Scripts violated Cal. Civ. Code Section 56.06(e) because it did not maintain the confidentiality of users' medical information. Express Scripts disclosed to third parties Plaintiff's and Class Members' medical information without consent, including information concerning medications they were taking or were prescribed.

157. Plaintiff and the members of the California Subclass are patients of Defendant, as defined in Civil Code § 56.05(k).

Deleted: SECOND

158.    Cal. Civ. Code § 56.10 (a) prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

159.    Express Scripts disclosed medical information without first obtaining authorization when it disclosed to third party Facebook Plaintiff's and Class Members' data, including PII and prescription requests.  No statutory exception applies.

160.    Express Scripts knowingly and willfully disclosed medical information without consent to Facebook for financial gain.  Namely, to market and advertise its services, or to allow others to market and advertise its services, in violation of Cal. Civ. Code Section 56.10, subdivision (a).

161.    Express Scripts shared this identifiable information with third party, Facebook, whose primary business includes selling advertisements, analytics, or other insights based on the data it obtains about individuals, and using such data to improve its products, services, and algorithms.

162.    Express Scripts knowingly and willfully disclosed medical information without consent to Facebook for financial gain.  Namely, to sell more products, advertise, obtain analytics, and improve the Express Scripts Platform, in violation of Cal. Civ. Code Section 56.06(e). Defendant's conduct was knowing and willful as it was aware that Facebook would obtain all user data input while using its Platform, yet intentionally embedded Facebook's code anyway.

163.    At the very least, Express Scripts negligently disclosed medical information in violation of Cal. Civ. Code Section 56.10, subdivision (a) through the unauthorized disclosure of Plaintiff's and Class Members' sensitive medical information.

164.    Because Civil Code § 56.101 allows for the remedies and penalties provided under Civil Code § 56.36(b), Plaintiff, individually and for each member of the California Subclass, seeks nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2) and damages provided by the common law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members pray that judgment be entered against Defendant, and Plaintiff and Class Members be awarded relief from Defendant, as follows:

THIRD AMENDED CLASS ACTION COMPLAINT                                      27
CASE NO. 3:25-CV-01170-AMO

Deleted: SECOND

a.   Certify the Class and appointing Plaintiff as the Class's representative;

b.   Finding Defendant's conduct was unlawful, as alleged herein;

c.   Awarding declaratory relief against Defendant;

d.   Awarding such injunctive relief and other equitable relief as the Court deems just and proper;

e.   Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

f.   Awarding Plaintiff and Class Members pre-judgment and post-judgment interest;

g.   Awarding Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses; and

h.   Any other relief the Court may deem just and proper.

## TRIAL BY JURY

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff and Class Members are entitled to, and demand, a trial by jury.

Dated:  August 26, 2025           **BURSOR & FISHER, P.A**.

By:     */s/ L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
Jenna L. Gavenman (State Bar No. 348510)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
        jgavenman@bursor.com
        jglatt@bursor.com

**SWIGART LAW GROUP, APC**
Joshua B. Swigart (State Bar No. 225557)
2221 Camino del Rio S, Suite 308
San Diego, CA 92108

THIRD AMENDED CLASS ACTION COMPLAINT                          28
CASE NO. 3:25-CV-01170-AMO

Formatted: Indent: Left: 0"

Deleted: SECOND

Telephone: (866) 219-3343
Facsimile: (866) 219-8344
E-mail: Josh@SwigartLawGroup.com

**THE BARRY LAW OFFICE, LTD**
Peter F. Barry (MN #0266577)
*Admitted pro hac vice*
1422 Asbury Street
St. Paul, MN 55108
Telephone: (612) 379-8800
E-mail: pbarry@lawpoint.com

*Attorneys for Plaintiff*

THIRD AMENDED CLASS ACTION COMPLAINT                                    29
CASE NO. 3:25-CV-01170-AMO

**Deleted:** SECOND